S. W. COOK, Administrator, Appellant, v. MARTHA UNDERWOOD et al., Appellees.

No. 39869.

*Nichols, Nichols & Milroy* and *Kirkland & St. Clair*, for appellant.

*Tobin, Tobin & Tobin,* for appellees.

MORLING, C. J.—On February 24, 1911, E. Underwood made the will now in question. By the first paragraph, testator directs payment of his debts. The second and third paragraphs read as follows:

"Second. I give and bequeath to my wife Martha Underwood all of the balance of my personal estate and all of my real estate wherever found for her use during her lifetime or so long as she shall remain my widow.

"Third. That on the decease of my wife Martha Underwood or her marriage I direct that all of my estate shall be equally divided between my heirs, Paul A. Underwood, W. Ray Underwood and Myrtle E. Underwood Cook—each to share alike. Provided—That if my daughter Myrtle E. Underwood should die before my wife Martha without direct heirs, then the said estate shall be equally divided between my sons Paul A. Underwood and W. Ray Underwood or their heirs."

The wife, Martha, is by the fourth paragraph appointed executrix. No further provisions are made by the instrument. At the time the will was made, Myrtle Underwood Cook was an expectant mother, a fact that was the subject of conversation between testator and his wife. A child was born to Myrtle in March following, but lived only a few days. Myrtle had

no other children born of her body. E. Underwood died January 13, 1914, and his will was admitted to probate February 19, 1914. On March 19, 1915, Myrtle and husband, C. B. Cook, in due form adopted the defendant Gertrude Cook. Myrtle died September 7, 1925. Plaintiff was appointed her administrator.

Of a number of interesting and difficult questions argued with great ability and industry by both sides, we find it necessary to discuss but the one whether the adopted daughter, Gertrude, is the "direct heir" of Myrtle, within the meaning of the testator, as expressed in his will. The object of testamentary interpretation is to ascertain, and, so far as it can be done consistently with the rules of law, give effect to, the purpose of the testator. To this end, the court, as nearly as it can, places itself in the situation and environment of the testator at the time of the making of the will. Obviously, this testator had in mind as the sole objects of his bounty his wife and his three children.

Testator was a farmer; had had no legal training. The writer of the will had been a justice of the peace, and in the employment of the government in Arizona, as "allotting agent." He was not a lawyer, though he had drawn a number of wills. It is proper to say, therefore, that neither testator nor the scrivener was familiar with the strictly legal meaning of, or were capable of using in a strictly legal sense, the word "heirs," nor did they understand such rules of law as those governing the vesting of estates, lapsing of bequests, substitution of devisees, etc. Their language used in the drawing of this will was popular, rather than technical or professional. The word "heir," as popularly used, often means "issue," "children," or "descendants." In the construction of wills, the word is given that meaning when, from the language of the entire will and the circumstances in which it was executed, such appears to have been the intention of the testator. *In re Estate of Clifton,* 207 Iowa 71.

In the will in question, the word "heirs" is used as the equivalent of "children," as "sons," and "daughter." Testator directed that, at the death or remarriage of his wife, all his estate should be equally divided between his "heirs Paul A. Underwood, W. Ray Underwood and Myrtle E. Underwood." These were his children. They might or might not be his

"heirs," depending on whether they survived him or not. The word "heirs" is here clearly used in the sense of "children." Changing his terminology, but pointing even more definitely to his children, he says that:

"If my daughter Myrtle E. Underwood should die before my wife Martha without direct heirs then the said estate shall be equally divided between my sons Paul A. Underwood and W. Ray Underwood, or their heirs."

Myrtle, who had been previously denominated "heir," is now called "daughter," and Paul and Ray, previously denominated "heirs," are now "sons." Testator had specifically in mind the third of his accumulations that would go to Myrtle if she survived her mother. It is clear that he was solicitous lest that third should be lost to his own blood. *Bladt v. Bladt,* 191 Iowa 1344, 1346; *Warden v. Overman,* 155 Iowa 1. It is a reasonable inference that he regarded Myrtle's life as more uncertain than that of the sons. He did, as the evidence shows, have in mind that Myrtle was a prospective mother. He could not know, however, whether Myrtle would have born to her a child who would survive her. Manifestly, he desired that such child, should it survive her, should take her place in the division of his estate. These two laymen endeavored to provide for that contingency by the use of the term "direct heirs." The ordinary meaning of the term "direct heirs" is "heirs" in the direct line of descent,—children and grandchildren. It is not contended that Myrtle's husband, C. B. Cook, was within testator's intended bounty.

There is no reason to believe that, at the time the will was made, or at the time of testator's death, any such thing as adoption by the daughter of a child was in contemplation. Clearly, from the testator's intention, as manifested by the will, he had no such thought. As is usual, testator, a husband and father, had definitely, and, it is reasonably to be inferred in this case, exclusively, in mind the care of his wife during her life and the distribution of his estate between his own children and their children. He was especially concerned that the one third that Myrtle might come into possession of, if she survived her mother, should not, in case she did not survive, and did not leave a child, should not be diverted from his other

children. We think this is the reasonable interpretation of the testator's purpose. It is reasonable to suppose that it never occurred to him that the daughter might adopt a child, and thereby divert one third of his children's patrimony.

By Section 3253, Code Supplement, 1913, in force at the execution of the will and at the date of testator's death, upon the execution, etc., of articles of adoption, "the rights, duties and relations between the parent and child by adoption shall be the same that exist by law between parent and child by lawful birth, and the right of inheritance from each other shall be the same as between parent and children born in lawful wedlock." Section 10501-b6, Code, 1927. This statute affects only the "duties and relations between the parent and child by adoption," and "the right of inheritance from each other." It does not determine the status of the adopted child as to the ancestor or other relative of the adopting parent. *Estate of Sunderland,* 60 Iowa 732; *Hockaday v. Lynn,* 200 Mo. 456 (98 S. W. 585); *Van Derlyn v. Mack,* 137 Mich. 146 (100 N. W. 278). The word "heirs" does not, of its own force, include adopted children of the beneficiary. 40 Cyc. 1461; *Estate of Sunderland,* 60 Iowa 732; *Reinders v. Koppelman,* 94 Mo. 338 (7 S. W. 288); *Morrison v. Estate of Sessions,* 70 Mich. 297 (38 N. W. 249); *Haver v. Herder,* 96 N. J. Eq. 554 (126 Atl. 661); *Smith v. Thomas,* 317 Ill. 150 (147 N. E. 788); *Wallace v. Noland,* 246 Ill. 535 (92 N. E. 956).

More emphatically, the word "heir" is not construed to include an adopted child of the beneficiary's, where the word is used in the sense of child, or where the specific term "child" is used, or heirs of the blood are in contemplation. *Warden v. Overman,* 155 Iowa 1. Particularly, the word "child" does not ordinarily include an adopted child. *Russell v. Musson,* 240 Mich. 631 (216 N. W. 428); *Yates's Estate,* 281 Pa. St. 178 (126 Atl. 254); *Smith v. Thomas,* 217 Ill. 150 (147 N. E. 788); *Woodcock, Appellant,* 103 Me. 214 (68 Atl. 821); *Albright v. Albright,* 116 Ohio St. 668 (157 N. E. 760); *Eureka Life Ins. Co. v. Geis,* 121 Md. 196 (88 Atl. 158); *Wallace v. Noland,* 246 Ill. 535 (92 N. E. 956). It is clear that the testator had in mind the substitution of the sons for the daughter in the event of the daughter's death "without direct heirs." They would thereby take under the will, as directly to them,—not through Myrtle.

646

*Scofield v. Hadden,* 206 Iowa 597; *Lyons v. Ostrander,* 167 N. Y. 135 (60 N. E. 334).

Whether or not it is expressed with sufficient clearness to make it the legal intent, we think that the will as a whole shows that the testator had more or less definitely in mind that, if Myrtle should have a child surviving the period of distribution, but Myrtle should not herself survive, the child should take the mother's place in the distribution. The court is of the opinion that the adopted child was neither within the contemplation of the testator as one who should succeed to the one third of the property in place of the daughter, Myrtle, on her death in her mother's lifetime, nor within the proper construction of the language of the will.—*Affirmed.*

STEVENS, FAVILLE, DE GRAFF, ALBERT, KINDIG, WAGNER, and GRIMM, JJ., concur.