HELEN SHAW et al., Administrators, Plaintiffs, Appellees, v. IVA SCOTT et al., Defendants, Appellants; ETTIE WILLIS et al., Codefendants, Appellees.

No. 42096.

JANUARY 9, 1934.

REHEARING DENIED MAY 19, 1934.

1260

I. R. Meltzer, and J. F. Loughlin, for appellants Iva Scott et al.

Lester C. Ary, and Jepson, Struble & Sifford, for appellees Helen Shaw and William Stanford, administrators de bonis non of estate of Dollie Bell.

Lew McDonald, for codefendant Elizabeth Nitz, special administrator of estates of Lizzie Richardson and J. C. Richardson, deceased.

Fred H. Free and E. O. Bundy, for codefendant Ettie Willis.

DONEGAN, J.—■■■ The plaintiffs in this case are seeking to establish the right of their decedent, Dollie Bell, to all the property in the estates of Lizzie Richardson, deceased, and J. C. Richardson, deceased. All the defendants, except the administrators of the estates of Lizzie Richardson, deceased, and J. C. Richardson, deceased, and W. H. Flickinger, clerk of the district court of Cherokee county, Iowa, are heirs at law of said Lizzie Richardson or J. C. Richardson. The rights of the plaintiff-administrators of the estate of Dollie Bell, deceased, are based upon the alleged adoption of Dollie Bell by J. C. Richardson and Lizzie Richardson, his wife, and upon the subsequent conduct of all parties to said adoption, who are all now deceased. In order to better understand the issues presented, a statement of the salient facts is at this time advisable.

In 1877, J. C. Richardson and Lizzie Richardson, his wife, sometimes referred to as Eliza Richardson, were residents of Cherokee county, Iowa, and had no children. At that time there also lived in Cherokee county, Iowa, not far from the Richardsons, a man named James Roberts, whose wife had but recently died leaving three children, one of whom was named Almeda Roberts, then five years old. After the death of Mrs. Roberts, J. C. Richardson and Lizzie Richardson desired to adopt Almeda, and James Roberts, who was desirous of obtaining a good home for her, consented to her adoption by the Richardsons. An instrument purporting to be articles of adoption was drawn up and executed by J. C. Richardson and James Roberts, and was placed in the hands of a third person. Under the terms of this instrument, Almeda Roberts was placed in the custody of J. C. Richardson and Lizzie Richardson and was known as Dollie Richardson. This name she bore until the time of her marriage to a man named Bell, after which she was known as Dollie Bell.

About July, 1882, James Roberts consulted Mr. Molyneaux, a lawyer at Cherokee, Iowa, in reference to the legality of the purported instrument of adoption, and was advised that, while such instrument might be sufficient to transfer the custody of the child to the Richardsons, it was not sufficient as a deed or articles of adoption. Mr. Molyneaux, in behalf of Roberts, thereupon notified the Richardsons, demanding that new and legal articles of adoption be executed by them. No attention having been paid to this notice, Mr. Molyneaux, in behalf of Roberts, began an action of habeas corpus in the district court of Cherokee county, Iowa, asking for the custody of his daughter or for the execution of legal adoption papers. A hearing was had in this cause, and on January 1, 1883, C. H. Lewis, as judge of said court, entered an order which is as follows:

"And now on this 1st day of January, 1883, it is ordered that the papers herein be filed with the Clerk of the District Court of Cherokee County, Iowa, in compliance with Section 3490, Code 1873 be had.

"C. H. Lewis, Judge 4th Jud. Dist.

"James T. Roberts v. James S. Richardson. & Eliza Richardson

"Findings by the Court:

"At request of the Defts. the facts are found herein and are as follows:

"1st. That shortly prior to July, 1877 the plaintiff James Roberts was a married man and that his family consisted of himself, wife and three children.

"2nd. That shortly before said July, 1877 the wife of the said James T. Roberts died and that at her death the three children herebefore mentioned were living, and that one of said children was Almeda Roberts and the same child in whose interest the writ herein is sought and that she was then about 5 years old.

"3rd. That on the 9th day of July, 1877 the said James T. Roberts and the deft. James S. Richardson signed the instrument in writing attached as Exhibit B to the petition of the plff. herein.

"4th. That at or about said date the said Almeda was by the said James T. placed in the care and custody of the said James S. & Eliza Richardson and that she has ever since so remained in their care and custody under and by virtue of said instrument.

"5th. That at the time of the execution of the said instrument

the same was delivered to James S. Richardson by plff. Roberts and was placed in the hands of one Wm. Clover to be kept for the signors thereof and that at the time of the signing of the same and the delivery thereof both parties to said instrument intended that Richardson should legally adopt the said Almeda Roberts as his own child and that both said parties supposed that the instrument by them signed was effective and complete for that purpose.

"6th. That during the time the said Almeda has lived with R. & R. the plff. has resided a part of the time out of the State of Iowa and a part of the time in the State & in the County of Cherokee and that while he was a resident in Cherokee he has frequently visited the said Almeda at the home of the defts., R. & R.

"7th. That both plff. Roberts and Deft. James S. thought the writing Exhibit B in effect a legal adoption of the child Almeda till on or about the month of July 1882 when plff. demanded of Deft. James S. that other papers should be made. That nothing was said by the parties farther with reference to the matter till about two months ago when plff. first demanded the custody of the child or execution of legal adoption papers at which time the plff. was willing Almeda should remain with defts. if the adoption papers should be made.

"8th. That the plff. Roberts is now remarried and has a home to which he can and to which he desires to take the said Almeda. That at said home there resides the plff. &. his wife and his one son Miller 8 years of age, the brother of Almeda.

"9th. That the children are affectionate toward the other and that the father and mother are both affectionate toward the children and that they are good and worthy people and fit in every way to have the care & custody of said Almeda.

"10th. That during all the time Almeda has been at the home of the Defts. R. & R. she has been properly & well fed, clothed, schooled & otherwise cared for. That the defts. have a good home for Almeda, and that they are worthy & good people and everyway fit to have the care and custody of the said girl. That defts. have a strong affection for Almeda and that she has same for them and desires to remain with them.

"11th. That the Exhibit 'B' was never recorded and that no other articles of adoption was ever made or tendered till after the commencement of this action when on the hearing of the cause

Defts. made answer and tendered to the plff. the articles offered in evidence herein and marked Exhibit 1.

"I find as matter of law.

"1st. That the writing signed by Roberts and Richardson attached to the petition and marked Exhibit 'A' was legal and operated to place the care and custody of the child Almeda with Richardson.

"2nd. That the said instrument did not absolutely and conclusively place the care & custody with said Richardson but that such custody and right thereto may be inquired into in the light of the said instrument and the present condition of the child and the parties Roberts and Richardson & Richardson.

"3rd. That the instrument Exhibit 'A' is not a legal adoption by Richardson of the said Almeda.

"4th. That until the future interposition of some Court or Judge the Defts. Richardson & Richardson are entitled to the custody of the said Almeda Roberts.

"It is therefore ordered that the care & custody of the said child Almeda Roberts be and remain in and with the said Richardson & Richardson and that the articles of adoption herein presented be filed with the Clerk of the Dist. Court of Cherokee Co., Iowa and that if the same should be signed by the said Roberts that then the same be entered of record as by law provided.

"It is further ordered that the plff. Roberts pay the costs of this action taxed as $—— and that execution issue therefor to all of which the said Roberts excepts.

"Jany 1, 1883.

"C. H. Lewis, Judge of District Court."

It is claimed by plaintiffs, and, we think, supported by the evidence, that the new articles which the order states were tendered by the defendants were executed by both Richardson and his wife and by Roberts. A search of the records in the offices of the clerk of the district court and of the recorder of Cherokee county failed to show that said new articles were ever entered on the records in either of these offices. The only thing found having any reference to the habeas corpus case was the record showing the order above set out and some entries on the clerk's fee book. Following the entry of said order, Almeda Roberts continued to live with J. C. Richardson and Lizzie Richardson and was known under the name of Dollie Richardson. At all times after she first went to live with them in

1877, she was treated by the Richardsons as their own child and was referred to by them and introduced by them to other persons as their adopted daughter. In May, 1899, she was married under the name Dollie Richardson to James E. Bell. Following her marriage, she and the Richardsons corresponded with each other and frequently visited each other. She was always referred to by the Richardsons as their daughter or as their adopted daughter, and she referred to them as her parents, calling them "Papa" and "Mamma". When children were born as the result of her marriage, the Richardsons referred to such children as their grandchildren, and the children referred to the Richardsons as their grandparents. We think the evidence sufficiently establishes that both J. C. Richardson and Lizzie Richardson and James Roberts all understood that Dollie Richardson Bell was the legally adopted daughter of J. C. Richardson and Lizzie Richardson, and that this understanding was also shared in by Dollie Richardson at all times after she was old enough to understand.

Dollie Bell died intestate on September 11, 1924. Lizzie Richardson died intestate on October 11, 1928, and J. C. Richardson died intestate on January 12, 1931. This action was instituted in equity in the district court of Cherokee county, Iowa, in August, 1931. Trial was had, and on the 22d day of August, 1932, the trial judge filed his decision, in which he found that the articles of adoption filed and tendered in the habeas corpus case in 1882 were sufficient in form and executed by Richardsons and Roberts, but that they did not constitute a legal adoption. He further found, in substance, that the said articles of adoption were executed by the said Richardsons and by James Roberts with the intention and understanding that they were legal and valid articles of adoption; that all of said parties had continued to understand that Almeda Roberts was the legally adopted daughter of the Richardsons at all times after the execution of said instrument; that James Roberts and Almeda Roberts, later known as Dollie Richardson, had fully performed and done all things necessary to be done and performed by them, pursuant to the agreement contained in said articles; and that the defendants were estopped from denying that said Almeda Roberts, later known as Dollie Richardson and Dollie Bell, was the lawfully adopted daughter of said J. C. Richardson and Lizzie Richardson. A decree was entered in accordance with said decision in which the court found for the plaintiffs and found that the estate

of Dollie Bell and the legal representatives thereof were entitled to all the property left by J. C. Richardson and Lizzie Richardson, deceased, subject to the expenses of administration. From this decree the defendant heirs of J. C. Richardson and Lizzie Richardson appeal.

At the time of the execution of the alleged articles of adoption by the Richardsons and Roberts in 1882, and until 1927, when changed by the Acts of the Forty-second General Assembly (chapter 218), adoption in this state was effected by an instrument in writing signed and acknowledged by the parents of the child, or in some cases by certain public officials authorized to act in lieu of the parents, and by the adopting parents, and by recording such instrument in the office of the county recorder. The early decisions in this and other jurisdictions in cases involving the adoption statutes tended toward a strict construction. The injustice of allowing persons who were strangers in every respect, except ties of blood, to step in and take property of an intestate which he had intended to go to one whom he understood to be his heir under articles of adoption, could not appeal to the conscience of a court of equity, and such statutes were later construed more liberally, and the courts of equity began to enforce provisions contained in deeds or articles of adoption in reference to property rights, although such deeds or articles of adoption did not comply with the provisions of the statutes and were thus insufficient to constitute the relation of parent and child.

In the case of Chehak v. Battles, 133 Iowa 107, 110 N. W. 330, 331, 8 L. R. A. (N. S.) 1130, 12 Ann. Cas. 140, there was involved articles of adoption which were held insufficient to constitute an adoption because not acknowledged by all parties thereto. These articles of adoption, however, provided that the rights of the child should be those of a child born to the adopting parents in the state of wedlock "and that the same shall include all the rights of inheritance by law." Justice Ladd, in a very exhaustive opinion, held that, while the court could not recognize the articles of adoption as complying with the statute, it would nevertheless enforce the contract provision contained in such articles by which the child was given the right of inheritance by law. In the case of Anderson v. Blakesly, 155 Iowa 430, 136 N. W. 210, the articles of adoption were held invalid because executed by the mayor of a town without statutory authority. The articles contained a provision that the child

should be the lawful heir of the adopting parents, and this provision was enforced as a contract for the benefit of the child. Again, in the case of Young v. McClannahan, 187 Iowa 1184, 175 N. W. 26, the articles of adoption were held insufficient as such because not recorded until after the adopted child had reached her majority. The articles contained a provision by which the adopting parents conferred upon the child "all right, privileges, and responsibilities which would pertain to said child if born to us in lawful wedlock." This provision of the articles of adoption was enforced as a contract.

In each of these cases it was held that a court of equity would enforce the contract provision contained in the articles of adoption, because the evidence in each case showed that the parties had intended and understood the articles to constitute a legal adoption and had performed all the duties which would have devolved upon them had the articles been legally sufficient for that purpose. In the case of Young v. McClannahan, supra, a mother had signed articles of adoption by which she intended to give her daughter in adoption to McClannahan and wife, who had no children. After the death of the adopting parents, their collateral heirs made claim to their property and claimed that the articles of adoption were insufficient because not recorded until after the child had attained her majority. Justice Ladd, in writing the opinion of the court, said:

"They [McClannahans] consented to adopt, and then defined what they intended thereby; i. e., to confer 'all the right' she would have had, if their own offspring. This mode of expression was not different in meaning than had they directly agreed to confer such right. The circumstance that the language employed was substantially that of section 3250 of the Code, defining the consequences of adoption, strengthens, rather than weakens, this conclusion, for there can be no doubt but that under such definition the adopted child is entitled to inheritance, though section 3253 also so states. The McClannahans either negligently or designedly failed to record the instrument and thereby prevented the proposed adoption becoming effective as such. This omission was through no fault of the mother, who departed this life two years after the adoption, nor of the child, who was of tender years, and probably knew nothing of the existence of the paper until too late to record, and neither the McClannahans nor their heirs are in a situation to complain if the instrument before us is construed independently of the statutes of

adoption, and the rights derived thereunder enforced precisely as though no such statutes existed. Whatever may have been the original purpose to be effected through the omission to record, the instrument never became other than a mere contract between the parties, and upon performance the cross-petitioner became entitled to 'all the right' which would have pertained to her, had she been born to the other parties to the agreement in lawful wedlock. Such a child would have inherited all their estate, real and personal, and therefore she is entitled thereto by virtue of the contract."

In all of the cases above cited the purported articles of adoption were in evidence and showed contract provisions in addition to the bare statutory requirements of an agreement to adopt. In the case at bar we have no evidence as to the contents of the articles of adoption. We think the evidence sufficient to establish that articles of adoption sufficient in form were executed by the Richardsons and by James Roberts, but we have no evidence from which we can determine whether such articles of adoption contained any express provision other than the statements required by the adoption statute. We have held that we cannot enforce specific performance of a mere agreement to adopt. Webb v. McIntosh, 178 Iowa 156, 159 N. W. 637; Morris v. Trotter, 202 Iowa 232, 210 N. W. 131, 133. In the case at bar, however, we are not asked to enforce an agreement to adopt. We are asked to hold that the heirs of the adopting parents are estopped from denying the status of the adopted child, because, aside from the failure to record it, such agreement has already been executed by all the parties thereto.

It is conceded by the parties to this action that the question of estoppel here presented has not hitherto been considered by this court. So far as we can find, the only reference of this court to such question is that contained in Morris v. Trotter, supra, wherein it is said:

"In other cases courts have somewhat persuasively applied the doctrine of estoppel to support the claim of a foster child where there had been an ineffectual attempt at a statutory adoption and all the obligations that would have arisen from a valid adoption had been fulfilled by the child. This has usually been where the proceedings of adoption were of a judicial nature, and in many of the cases there was present a contract relating to property rights. See Kenning v. Reichel, 148 Minn. 433, 182 N. W. 517, 16 A. L. R.

1016, and note in the last-named publication. Estoppel is not specifically relied upon here."

As stated in Morris v. Trotter, supra, the doctrine of adoption by estoppel has been considered in other jurisdictions. In the annotations in 27 A. L. R. 1365, it is stated:

"The cases considering the matter are in substantial harmony in sustaining an estoppel in pais to preclude adoptive parents and their privies from asserting the invalidity of adoption proceedings, or, at least, the status of the adopted child, when, by performance upon the part of the child, the adoptive parents have received all the benefits and privileges accruing from such performance, and they by their representations induced such performance under the belief of the existence of the status of adopted child."

In the case of Holloway v. Jones (Mo. Sup.) 246 S. W. 587, 591, the court, after referring to previous cases, said:

"In all these cases it is held, in substance, that one who takes a child into his home as his own, receiving the benefits accruing to him on account of that relation, assumes the duties and burdens incident thereto, and that where justice and good faith require it the court will enforce the rights incident to the statutory relation of adoption. The child having performed all the duties pertaining to that relation, the adopting parent will be estopped in equity from denying that he assumed the corresponding obligation. In equity it will be presumed that he did everything which honesty and good conscience required of him in justification of his course. Equity follows the law except in those matters which entitle the party to equitable relief, although the strict rule of law be to the contrary. It is at this point that their paths diverge. As the archer bends his bow that he may send the arrow straight to the mark, so equity bends the letter of the law to accomplish the object of its enactment."

In Fiske v. Lawton, 124 Minn. 85, 144 N. W. 455, it was said:

"Moreover, the deceased voluntarily entered into the contract, and pursuant thereto received, during her life, the benefits of the relation thereby created, the services, society, affection, and devotion of an adopted daughter made her own. No principle of law or equity requires a holding that respondent can avail herself of technical objections to the child's status, the validity of which, so

far as appears, remained undisputed by deceased, after full performance of the contractual relations therein involved."

In In re McKeag's Estate, 141 Cal. 403, 74 P. 1039, 1040, 99 Am. St. Rep. 80, letters of administration were issued to one claiming to be the adopted child of the deceased. An application to have the letters revoked was made by one of the heirs at law of deceased. The court, after reciting the facts as to the adoption proceedings, the subsequent recognition of the relation of parent and child, the performance of the duties by the parties, and to the beneficent results of adoption statute, said:

"Recognizing these good results, courts are more and more inclined to an abandonment of the old rule of strict construction, and to place a fair and reasonable construction upon proceedings under the statute, with a view of sustaining the assumed relationship, particularly against a collateral attack by strangers to the proceedings, whose only interest is to defeat the relations which the adoptive parents always recognized and never questioned, so that they may succeed to an estate from which, by the very fact of adoption, the adoptive parents intended they should be excluded, in favor of the adopted child. * * * Without, however, discussing this point further, we are satisfied that appellant, claiming under Cora V. McKeag, the adoptive mother, is estopped as effectually as she would be in her lifetime from questioning the validity of the adoption proceedings—certainly, at least, to the extent that any irregularities in the method of procedure are invoked to disturb them. The deceased in her lifetime could not have questioned them, and appellant stands in no better right to attack them than the deceased would have had."

Other cases sustaining the doctrine that the heirs of adopting parents will be estopped from denying the validity of the adoption are: Barney v. Hutchinson, 25 N. M. 82, 177 P. 890; Horton v. Troll, 183 Mo. App. 677, 167 S. W. 1081; Pemberton v. Pemberton, 76 Neb. 669, 107 N. W. 996; In re Gunn's Estate, 227 Mich. 368, 198 N. W. 983; In re Wolf's Appeal (Pa. Sup.) 13 A. 760; Van Matre v. Sankey, 148 Ill. 536, 36 N. E. 628, 23 L. R. A. 665, 39 Am. St. Rep. 196; In re Reichel, 148 Minn. 433, 182 N. W. 517, 16 A. L. R. 1016; In re Biehn's Estate (Ariz.), 18 P. (2d) 1112. See, also cases cited in annotation 16 A. L. R. 1030.

Appellants contend that all the cases in which the doctrine of estoppel has been applied to prevent the heirs of adopting parents from questioning the validity of adoption proceedings have arisen under statutes which provide for adoption by judicial proceedings, and that no case can be found in which this doctrine has been applied where the adoption is effected by the execution of a deed or articles of adoption to be signed, executed, and recorded, as was provided by the statutes in force in this state prior to 1927. Appellees concede that this is true, but argue that it is true only because in most jurisdictions adoption is by judicial proceedings, and counter with the statement that no cases can be found in which estoppel has been held to be not available because the proceedings were not of a judicial nature. It must be admitted that the more recent decisions of this state, while liberally construing the adoption statutes and enforcing the provisions of adoption agreements pertaining to property rights, have hitherto refused to recognize articles of adoption as sufficient where material provisions of the statutes have not been complied with, and have refused to enforce the specific performance of such articles as a contract to adopt. However, we are here dealing with a different situation. The contract of adoption involved in this case has already been performed by all the parties with the single exception that it was not recorded. That the Richardsons in good faith fully intended to adopt Dollie as their own child, there can be no doubt. Until 1882 both they and Roberts thought the instrument executed in 1877 sufficient for that purpose. The habeas corpus action instituted by Roberts was for the purpose of establishing the status of the child or recovering her custody, and the Richardsons responded by an answer with which they tendered new articles of adoption. The court ordered that these articles of adoption be filed with the clerk and that, if signed by Roberts, they then be entered of record as by law provided. The findings and order of the court and surrounding circumstances are sufficient to indicate that these articles of adoption had already been signed by the Richardsons, and that the only thing required to complete the adoption was the execution of such articles by Roberts and the recording of the same. That they were executed by Roberts is sufficiently shown by the evidence. As the grantees in these articles or deed of adoption, and under the provisions of the order of the court, it became the duty of the Richardsons, upon the execution of said articles of adoption by Roberts, to see that they were entered

of record as by law provided. The failure to have these articles recorded was a violation of a duty on the part of the Richardsons. There is nothing to indicate that this failure of the Richardsons was intentional or due in any way to bad faith. On the contrary, all the evidence indicates that they acted in good faith and at all times thereafter honestly believed that Dollie was their legally adopted child. Their failure to record the articles of adoption was probably due to oversight or misunderstanding; but to whatever cause it may be ascribed, the position of Roberts and his daughter was changed in reliance on the performance of this duty by the Richardsons, and remained so changed for the balance of their lives. The subsequent conduct of the Richardsons toward Dollie could not but strengthen her belief that she was their legally adopted daughter, and impliedly, at least, amounted to representations that the Richardsons had fulfilled and would continue to fulfill the duties devolving upon them as her parents by adoption.

This contract contained in these new articles of adoption was recognized, acted upon, and carried out in good faith by the Richardsons, by James Roberts, and by Almeda Roberts, later known as Dollie Richardson and Dollie Bell, as long as they lived. None of the parties ever questioned the existence or the validity of the contract. The evidence amply shows that the Richardsons received all the benefits which they could have sought and expected when they entered into the adoption agreement. The evidence further shows that the Richardsons recognized Dollie as their own child, gave her their family name, referred to her and introduced her as their daughter, and expressed not only their intention that she should have their property when they died, but also their understanding that under the articles of adoption which had been entered into by them it would go to her as their adopted child and heir. The evidence clearly shows that Dollie performed the duties and gave to the Richardsons all the love and affection which could have been theirs if she had been their own natural child, and that her children brought to them in their old age the same joy and consolation which would have been theirs if these children had been related to them by ties of blood. Aside from the blood relationship, the evidence does not show any facts or conduct on the part of the appellants which would entitle them to the consideration of J. C. Richardson or Lizzie Richardson.

In the cases above cited in which heirs have been estopped from denying the legality of an adoption, it will be noted that the courts did not base the estoppel solely on the ground of the adjudication made in a legal proceeding, but in practically all of these cases great stress was given to the justice and the equities in favor of the adopted child. We see no reason why the justice and equities in favor of a child who has to the fullest extent performed all the duties and bestowed all the love and affection that the adopting parents would have received from a natural child are not just as real and persuasive in the case of a contract of adoption as they could possibly be if the adoption had been by judicial proceedings. In our opinion, the facts of this case are much stronger than those in many of the cases cited above in which the heirs of the adopting parents have been estopped, and, if the doctrine of estoppel cannot be applied in this case, this must be for the simple reason and for no other reason than that the technical requirements of the adoption statutes were not complied with.

While this court has never held an agreement of adoption to be enforceable as such where there was a failure to comply substantially with the essential provisions of the adoption statutes, our later decisions unmistakably disclose a tendency to construe the requirements of these statutes liberally, in order to carry out the intentions of the parties and to protect the interests of a child who has been the subject of an attempted adoption and who has in every way complied with the adoption agreement and fulfilled the duties of an adopted child, as against collateral heirs whose only claim to the property of the adopting parents is that of blood relationship. The attitude of this court in such cases is clearly shown by the language used by Justice Ladd in the case of Chehak v. Battles, supra, wherein he said:

"The obligations of such a contract as of others are mutual, and the peculiarities of it such as emphasize the right of him who has faithfully performed his part of it to that portion stipulated by the other party. It is impossible to estimate by any pecuniary standard the value to the parties receiving a child, nor is there ever any design of so measuring the service and solace bestowed. The nature of the contract necessarily precludes all thought of returning the consideration, and after the mother has yielded the possession of her child with all that this means, and it has lived until majority

as a dutiful and loving son or daughter with those who have promised to cherish him or her as their own, and that he or she shall share their estate, it is beyond the power of the adoptive parents or the courts to place the mother or child in the situation in which they were before the agreement was entered into. There is no such thing in cases like this as placing the parties in statu quo, and the remedy must be by specifically enforcing the contract or the denial of rights which have been fully earned, and in good conscience and justice ought to be enforced."

That this court has no intention of returning to the old rules of strict construction, but, on the contrary, will recognize the laudable purposes and beneficent results of adoption, and will continue to construe adoption statutes with liberality and with a view to carrying out the spirit of their provisions, is evidenced by the statement contained in In re Estate of Wadst, 209 Iowa 1200, 229 N. W. 835, 839, wherein it is said:

"It must be borne in mind that the matters involved in the present litigation arise as between the adopted child upon the one hand, and collateral heirs, claiming through the adopting father, upon the other hand. In Seibert v. Seibert, 170 Iowa 561, 153 N. W. 160, we declared:

"'We apprehend that an important matter to be considered on the question whether a strict or liberal construction should be given would depend upon who is making the contest.'

"In 1 R. C. L. 595, in considering this question, the author aptly declares:

"'It has been said that the adoption statutes tend to conserve the best interests of society and the state, and that, recognizing these good results, courts are more and more inclined to abandon the old rule of strict construction and to place a fair and reasonable construction upon proceedings under a statute relating to adoption with a view of sustaining the assumed relationship, particularly against a collateral attack by strangers to the proceedings, whose only interest is to defeat the relations which the adoptive parents always recognized and never questioned, so that they may succeed to an estate from which, by the very fact of adoption, the adoptive parents intended they should be excluded in favor of the adopted child.' "

Every conceivable principle of justice and equity sustains the

1274

claim of the plaintiffs herein as against the claim of the collateral heirs. We think the facts are such as would have estopped J. C. Richardson and Lizzie Richardson from denying to Dollie·Bell the status of an adopted child, and the defendant heirs are in no better position to attack her right to the property of the Richardsons than were those under whom they claim.

It is further contended by the appellants that, even if Dollie Bell had been the legally adopted child of J. C. Richardson and Lizzie Richardson, she having predeceased the Richardsons, her children cannot by representation inherit from them. In support of this contention, the appellants cite In re Estate of Sunderland, 60 Iowa 732, 13 N. W. 655; Baker v. Clowser, 158 Iowa 156, 138 N. W. 837, 43 L. R. A. (N. S.) 1056; Cook v. Underwood, 209 Iowa 641, 228 N. W. 629.

In the Sunderland case, the right of the child to inherit was based upon a special statute of adoption passed by the General Assembly of Louisiana, and the conclusion reached was based upon a construction of the entire statute which the court held did not constitute her an heir of her adopting parents to the extent of enabling her to inherit *through* them.

In the Baker case, the adopting parent had predeceased the adopted child, and thereafter the adopted child died intestate without leaving husband or children, and the court held that the natural parents of the adopted child would inherit as her heirs instead of the heirs of the adopting parent. The opinion does not attempt to define the rights of inheritance of the children of an adopted child who has predeceased the adopting parent, and the reasoning can perhaps be applied more favorably to the appellees than to the appellants in this case.

In the Cook case, the question involved was the construction of a will, and the conclusion reached was based upon a construction of the entire will and held that the word "heir", as therein used, did not refer to an adopted daughter. The conclusion reached was not based upon a construction of the adoption statutes, but upon the language of the entire will and the surrounding circumstances from which the intention of the testator was reached.

The only case cited by appellants in which the question of the right of the children of an adopted child to inherit from the adopting parent was directly passed on is Harle v. Harle, 109 Texas 214,

204 S. W. 317, 319, 15 A. L. R. 1261. The decision in that case was based upon a construction of the Texas statutes. After referring to decisions in other states upholding the right of children of an adopted person to inherit from the adopter, the opinion proceeded to state that these decisions were based upon the two propositions derived from the civil law origin of adoption, viz: that children of an adopted child stood in the position of grandchildren of the adopted parent, and that the term "heir", when used in the adoption statute, implies representation; and then concluded with this language:

"In our opinion, neither of these propositions should have controlling weight in construing our statutes. As pointed out in Eckford v. Knox [67 Tex. 200, 2 S. W. 372], the civil law doctrine was so modified by the terms of our adoption statute as to preclude giving children of an adopted person the status of grandchildren of the adopter."

Adoption was unknown to the common law, but has been borrowed from the civil law, and by legislative enactment has become a part of the body of laws of various jurisdictions. In practically all of these jurisdictions the legislation enacted has maintained the features of the civil law by which the children of an adopted child stood in the position of grandchildren of the adopting parent, and the term "heir", when used in the statutes, implied representation. As stated in the head note in 15 A. L. R. 1265:

"The great majority of Statutes of Adoption and of Descent and Distribution which have been construed have been held to entitle the children of an adopted child who has predeceased the adoptive parent to inherit from the adopter as though the adopted child had been a child by blood; or, in other words, the decisions pass the status and rights of the adopted person on to his children so as to permit them to inherit from the adopting parent."

Section 2310 of the Code of 1873, which was in effect at the time of the attempted adoption of Almeda Roberts by J. C. Richardson and Lizzie Richardson, provided that:

"Upon the execution, acknowledgment, and filing for record of such instrument, the rights, duties, and relations between the parent and child by adoption, shall, thereafter, *in all respects, includ-*

*ing the right of inheritance, be the same that exist by law between parent and child by lawful birth."* (Italics are writer's.)

Section 12016 of the Codes of 1924, 1927, and 1931, in reference to descent and distribution of an intestate's property, provide that, subject to the rights of a surviving spouse, the remaining estate of the decedent shall "descend in equal shares to his children, unless one or more of them is dead, in which case the heirs of such shall inherit his or her share in accordance with the rules herein prescribed, in the same manner as though such child had outlived its parents."

In Gray v. Holmes, 57 Kan. 217, 45 P. 596, 598, 33 L. R. A. 207, it was contended that adoption conferred upon the adopted persons' heirs no right to inherit from the adopter, because the statute of descents, in the use of the word "children", referred only to children by blood. In refusing to adopt this view, the court said:

"The adoption of children is an invention usually accredited to the civilians. It is not of common-law origin. It is now common in Europe, and is recognized and regulated in most of the states of our Union by statute. In Vidal v. Commagere [1858] 13 La. Ann. 516, it is stated, on the authority of the Digest, that 'under the Roman law, the person adopted entered into the family, and came under the power of the person adopting him. And the effect was such that the person adopted stood, not only himself in relation of child to him adopting, but his children became the grandchildren of such person.' * * * In the construction of a statute founded upon a principle of the Roman law, we are authorized to appeal to that law as an aid in the interpretation of the statute. And we think it plain, from the language of our statutes, construed in the light of the adjudged cases and the principles of the civil law, that the widower and the child of Alice Ann inherited, through her, an interest in the estate of Adam Huffman."

Other cases to the same effect are: Pace v. Klink, 51 Ga. 220; Power v. Hafley, 85 Ky. 671, 4 S. W. 683; Atchison v. Atchison, 89 Ky. 488, 12 S. W. 942; Fiske v. Lawton, 124 Minn. 85, 144 N. W. 455; Bernero v. Goodwin, 267 Mo. 427, 184 S. W. 74; Williams v. Weber, 271 Mo. 150, 195 S. W. 1009; In re Cupples, 272 Mo. 465, 199 S. W. 556; Kroff v. Amrhein, 94 Ohio St. 282, 114 N. E.

267; In re Webb's Estate, 250 Pa. 179, 95 A. 419; In re Walworth, 85 Vt. 322, 82 A. 7, 37 L. R. A. (N. S.) 849, Ann. Cas 1914C, 1223.

If Dollie Bell had been lawfully adopted by J. C. Richardson and Lizzie Richardson, she would have acquired all the rights and relations of a natural child and, under the principles of the civil law from which our law of adoption has been derived, and under the authority of the cases above cited and the provisions of section 12016 of the Code, she having predeceased both J. C. Richardson and Lizzie Richardson, her children are entitled to the share of the estate which would have gone to her if she had been the child of the Richardsons by blood.

For the reasons stated above, we conclude that the decree of the trial court was correct, and it is hereby affirmed.

CLAUSSEN, C. J., and EVANS, ALBERT, KINDIG, and KINTZINGER, JJ., concur.