## Noerr Estate

*Siegel & Siegel,* for widow and children of testator.

*Brugler & Levin,* for respondent executor.

*Lee L. Campbell* and *Rhoads, Simon & Reader,* for intervening shareholders.

CAMPBELL, P. J., Specially Presiding, August 11, 1970.—

## STATEMENT OF FACTS

Parties to the instant controversy are the widows and children of Floyd B. Noerr and his brother, Clair B. Noerr; Russell National Bank, Executor of the Estate of Floyd B. Noerr; Noerr Freight, Inc., and Lewistown Materials Company, Inc., closely-held corporations formed by the respective brothers.

Floyd B. Noerr and Clair B. Noerr incorporated their trucking business on January 24, 1950; as a result, both became equal owners.

Clair B. Noerr died on June 1, 1957; Floyd B. Noerr died on July 20, 1965. Both bequeathed their respective shares to their widows for life, remainder to their children. Clair had two children, a daughter and a son; Floyd had four children, a daughter and three sons.

Originally, at the time of incorporation, restrictions were placed on the transfer of shares in the corporation. These restrictions took the form of a first-option, that is, the corporation is given the first opportunity to buy a shareholder's shares at book value before they may be sold to outsiders. The original restriction stated, in part, that there was a right in the original subscribers:

". . . to shares, herein named, to devise and bequeath and to have transferred to their heirs, executors, administrators and assigns any of the shares of this corporation held by them without the requirement of first offering such shares to the corporation . . ."

However, by charter amendment dated November 3, 1950, the provision was amended to read:

". . . the right of the original subscribers to shares, *their lineal and direct heirs and legatees who shall be lineal and direct heirs of said original subscribers* to bequeath and to transfer and have transferred to their *lineal and direct* heirs any of the shares of this corporation held by them without first offering such shares

to the corporation." (Italics indicates words added by the amendment.)

The charter amendment of November 3, 1950, made a similar change in statement pertaining to the right:

". . . of any of *such* heirs, or of any court appointed administrators or trustees of the estate of any such original subscriber or *his lineal or direct heirs,* to acquire title and to have transferred to them any of the shares of this corporation held by such original subscriber *or his lineal or direct heirs* by virtue of descent under the Intestate Laws of the Commonwealth of Pennsylvania, without the requirement of first offering such shares to the corporation and its stockholders for purchase, no other heirs, nor the executors, administrators or assigns of any other holder of record of shares of this corporation, nor any other court appointed administrators or trustees, who may come into possession of any such shares shall acquire any right, title or interest in such shares without first being required to offer them for sale to the corporation as herein provided . . ." (Italics indicates words added by the amendment.)

Clair B. Noerr's will, dated February 7, 1950, recognized his wife and children as the objects of his affection and benevolence. Subsequent to his death on June 1, 1957, his widow, executrix, filed an accounting on November 25, 1960, wherein a statement of proposed distribution indicated the transfer of 50 percent of the stock owned by Clair to herself for life, remainder to her children.

President Judge Lehman entered a final decree on January 14, 1961, ordering that "distribution . . . be made by the Accountant as shown in the Statement of Proposed Distribution."

Some controversy arose over the right of the executrix of Clair B. Noerr's estate, his widow, to make the

proposed distribution. In order to make a distribution, an accord was reached through the vehicle of a family agreement: the statement of proposed distribution would be allowed to stand. Mary E. Noerr would agree to renounce her life estate under the will, the stock passing directly to their children, the remaindermen and direct heirs of testator. The remaindermen, Richard C. Noerr and Constance E. Noerr, would then execute agreements of trust. By virtue of the trust agreement, the shares of stock would be held by Richard and Constance for the benefit of their mother for her life or widowhood, whichever should terminate first, and then the stock would vest in the trustees, absolutely and individually. The corporations and Floyd B. Noerr, remaining stockholder, those who stood to benefit by the otherwise existent first option provision, were to join in the agreement (thereby constituting a waiver of the *possibly* applicable first-option agreement). These actions were taken and the agreements of trust were executed on February 3, 1961, by Richard C., Constance E., Mary E., Floyd B. and Donald G. Noerr as president of Noerr Freight and by Richard C. and Donald G. Noerr as vice president and secretary of Lewistown Materials Company, Inc.

When Floyd B. Noerr died on July 20, 1965, his will was probated in Mifflin County and letters testamentary were issued to the Russell National Bank. His will provided, inter alia, that his Class B voting stock in Noerr Motor Freight and Lewistown Materials was to go to his wife, Marguerite, ". . . to have the full use, benefit and income therefrom for and during the period of her natural lifetime or during her widowhood, whichever shall terminate sooner." Marguerite could consume or sell said shares with the approval of the majority of the children of decedent.

Soon the conflict as to the applicability of the restric-

tion in the form of a first-option to the corporation arose. After seeking the advice of counsel and much argument, the executor informed Marguerite A., Robert C. and James F. Noerr, also Pauline Watson, that it intended to sell all the stock at book value to the corporation, pursuant to the aforementioned restrictions contained in the articles of incorporation.

This controversy is in the form of an action against the Russell National Bank, executor of the Floyd B. Noerr Estate, by Marguerite A. Noerr, Robert C. Noerr, Pauline Watson and James F. Noerr to enjoin the executor from offering to sell the stock to the corporation and that an order be issued that the stock be distributed in accordance with the last will and testament of Floyd B. Noerr.

## QUESTION PRESENTED

Is the widow of one of the two original subscribers to the stock in said corporations subject to a first-option requirement, wherein the stock must be offered before sale to outsiders at book value to the corporation, when the restriction provides and recognizes the:

". . . right of the original subscribers to shares, their lineal and direct heirs and legatees who shall be lineal and direct heirs of said original subscribers to bequeath and to transfer and have transferred to their lineal and direct heirs any of the shares of this corporation held by them without first offering such shares to the corporation and its stockholders for purchase, or the right of any of such heirs, or of any court appointed administrators or trustees of the estate of any such original subscribers or his lineal or direct heirs, to acquire title and to have transferred to them any of the shares of this corporation held by such original subscriber or his lineal or direct heirs by virtue of descent under the Intestate Laws of the Common-

wealth of Pennsylvania, without the requirement of first offering such shares to the corporation and its stockholders for purchase"?

## DISCUSSION

1. Is the wife of Floyd B. Noerr a "lineal and direct heir" within the meaning of the words of the exemption from the first-option requirement?

a. Is Marguerite A. Noerr, widow of deceased Floyd B. Noerr, his "heir"?

It is the contention of the intervening respondents that the common law rules of interpretation are to be applied in determining this issue, and the surviving spouse is not an heir at common law. In support of this contention, intervening respondents cite a non-jurisdictional case, Higginbothom v. Higginbothom, 177 Ky. 271, 197 S.W. 627 (1917), which ruled that under the civil law of Kentucky the term "heir" refers to all persons called to the succession by act of the party; but in common law refers only to one born in lawful wedlock, *who takes the real estate*, and does not include a widow or widower.

However, such a clear cut rule of law does not appear in the Commonwealth of Pennsylvania. There is dictum in one early case to the effect that the term "heir" does not necessarily exclude the surviving spouse. More convincing, however, and persuasive to the petitioners' assertion is the fact that reference to the common law rule is not to be had, for the restriction bears an exception which refers to an exception for those who are lineal or direct heirs under the intestate laws of the Commonwealth of Pennsylvania. Thus, we must look to the legislative enactments to find who is an "heir" within the ambit of the exception.

In Barnard Estate, 351 Pa. 313 (1945), the court ruled that a surviving spouse is a statutory heir of the

estate of the other as to personal and *real property.* It is here noted that intervening respondents cited Higginbothom v. Higginbothom, supra, a Kentucky case which said that the devolution of real estate is the touchstone for the determination of who shall be an "heir." A later case reached a similar holding, citing Barnard, and relying heavily upon language found in the Wills Act of April 24, 1947, P. L. 89, sec. 14, 20 PS §180.14(4), which provides:

"Meaning of 'heirs' and 'next of kin', etc.— . . . A devise or bequest of real or personal estate, whether directly or in trust, to the testator's or another designated person's 'heirs', or 'next of kin', 'relatives', or 'family' or to 'the persons thereunto entitled under the intestate laws', or to the persons described by words of similar import, *shall mean those persons, including the spouse, who would take under the intestate laws* if the testator or other designated person were to die intestate . . ." (Italics supplied.)
and the Estates Act of April 14, 1947, P. L. 100, sec. 14, 20 PS §301.14(1), which states:

"Meaning of 'heirs' and 'next of kin', etc.— . . . Time of Ascertaining Class. A conveyance of real or personal property, whether directly or in trust, to the conveyor's or another designated person's 'heirs', or 'next of kin', or 'relatives' or 'family' *or to 'the persons thereunto entitled under the intestate laws',* or to persons described by words of similar import, shall mean those persons, *including the spouse,* who would take under the intestate laws . . ." (Italics supplied.)

Similarly, in Suter Estate, 47 D. & C. 2d 270, the court, pursuant to section 14(4) of the Wills Act, supra, turned to the intestate laws to determine who should constitute an "heir." Testator left his house to his sister for life, directing that upon her death it should be sold and the proceeds be distributed to his "heirs." This

was construed to mean that the proceeds be distributed to such of testator's next of kin as would be entitled to his estate under the intestate laws if he had died intestate on the date of his sister's death.

Finally, it is noted that the intestate laws of Pennsylvania clearly stipulate a specific interest of the surviving spouse in the other spouse's estate and that this portion shall be the first honored. See Intestate Act of 1947, 20 PS §1.1, et seq.

2. Assuming the term "heir" includes decedent spouse's widow, is the widow a "direct and/or lineal heir"?

The charters of the corporations refer to an exception to the first-option requirement; this exception being extended to the "lineal and direct heirs" of original subscribers, or, as referred to in another part of the charter, the "lineal *or* direct heirs" of original subscribers. Thus, assuming the widow, Marguerite Noerr, is an "heir," is she a "direct and/or lineal heir" of her husband?

Intervening respondents rely upon numerous dictionary definitions of the words "lineal" and "direct." Many of these definitions seem to indicate some importance to consanguinity in determining if one is a "direct heir," but the most often used dictionary, Black's Law Dictionary, 3rd ed., gives the word "lineal" a less restrictive and more general meaning: "that which comes in a line; especially a direct line, as from father to son."

Few Pennsylvania cases have clearly dealt with the problem of defining the terms "lineal" and "direct." In Schleich's Estate, 286 Pa. 578 (1926), the court was called upon to define the terms "blood heirs" as used by the testatrix in her will. The court found that the language "could not refer to persons other than children, and indicates the words 'blood heirs' were

used by testatrix in a limited sense, she having in mind only the children or direct lineal heirs." Of course, it must be noted that testatrix' intent is being construed, and in the instant controversy such a simple construction is not so availing, as we must remember testator has stipulated that lineal and/or direct heirs should be determined by the Intestate Act of 1947, specifically providing reference to the intestate laws. Such was not the case in the aforementioned Schleich's Estate, supra. It is also noted that this case arose before the Wills Act of 1947 with its rule of construction previously discussed which turns us to perusal of the intestate laws.

Intervening respondent cites Estate of Mary McKinney, 52 Pitts. L.J. (O.S.) 321 (1905), wherein the court defined the words "direct heirs." However, this case fails to shed any light on the inquiry for it merely defined "direct heirs" as "lineal heirs or issue" and is subject to the same former criticism, for the case was decided in 1905, long before the Wills Act of 1947.

However, a case that antedated the Wills Act of 1947 considered the problem of defining the words "lineal descendant," defining this term as follows:

"The word 'lineal' is defined 'as of nature of an *ancestral* line or lineage'; 'in the line of succession through lineage'; while 'lineage' is defined as '*ancestral* line of *consanguinity*'; '*pedigree*'; 'lineal descent from an ancestor' . . . It is obvious that all these definitions involve the inherent concept of *offspring* in the line of generation, that is, descendants who proceed in direct line *by birth* from the ancestor": Strunk Estate, 369 Pa. 478 (1952).

In Smith's Petition, 291 Pa. 129 (1927), testatrix directed that the remainder of her estate be equally divided among her four children, enumerating them, and further that "my children are to have share and

share alike as long as they live and in case of their death their share is to revert to their children." Testatrix made reference to her children as "my direct heirs" and the court, finding no words sufficient to enlarge the children's interest to a fee simple estate, said:

". . . the fact that, at one point in the instrument, testatrix refers to the latter (children) as her 'direct heirs' has no significance as indicating a special, or exclusive, care for them, since by that expression, as used, she meant evidently no more than 'first takers.' "

Thus, the case reflects the importance of ascertaining the probable intent of testator and not taking words used in their strict literal sense so as to defeat testator's intent.

Smith's Petition, supra, was cited to support an interpretation of the phrase "direct heirs" in Cook v. Underwood, 209 Iowa 641, 228 N.W. 629 (1930). The court found the term "direct heirs" as having the ordinary interpretation of "heirs" in the direct line of descent. However, the surviving spouse in this case was not adjudged a direct heir, for under Iowa law neither spouse was the heir of the other and could not be in the direct line of descent. While this was once the case in Pennsylvania, the legislative enactment of the Intestate Act of 1947 has altered this situation.

Only one other case in the Commonwealth has touched this issue: Estate of Mary McKinney, supra. This was an Allegheny County case applying the Rule in Shelley's Case so as to create a fee tail in testatrix' children. Her will provided:

"When all the children are deceased, the estate is to be divided equally among their direct heirs.

"Should any child die without issue, the portion of such child shall be divided equally between the direct heirs of the other children."

The court interpreted the words "direct heirs" as follows:

"By 'direct heirs' the testatrix meant lineal heirs or issue."

But again this case must be distinguished in that it arose before the enactment of the Intestate Act of 1947, and in interpreting the intent of the testator, we must assume testator was aware of the law, i.e., the Intestate Act and Wills Act.

Several nonjurisdictional cases have considered this definitional problem. East's Estate, 325 Mich. 352, 38 N.W. 2d 889 (1949), adjudicated this issue. Testator, Enos East, bequeathed $50 to each of his brothers and sisters and a life estate to his wife, remainder to a child not of consanguinity whom he had brought up, further providing that if the child died without "direct heirs," remainder should go to testator's brothers and sisters, all of whom predeceased the wife-life tenant. The court held that the remainderman's widow was a "direct heir" and entitled to the real estate in question. Petitioner, a nephew, argued that "direct heirs" were limited to lineal descendents, blood relatives, but the Supreme Court of Michigan reversed, stating:

"In construing a will, the Court will favor a construction which conforms more nearly to the general law of inheritance.

"In Smith's Petition, 291 Pa. 129 . . . the conclusion reached by the court was expressed in the following language: ' . . . testarix refers to . . . her "direct heirs" . . . (and) she evidently meant no more than "first takers." '

"Applying the above conclusion to the case at bar, in considering the intent of the testator as to who would be the 'direct' heirs of Percy C. Hunt, under the law of descent of real estate in this State his surviving widow Minnie C. Hunt and his two surviving sisters would be 'first takers' of his estate.

"We are not in accord with the view taken by the lower court, that the testator intended by the use of the term 'direct heirs' to exclude the surviving spouse of Percy C. Hunt. *'Direct heirs' is not limited to lineal descendants as appellee contends."* (Italics supplied.)

There is a marked similarity between the Michigan Intestate Act, 20 Mich. Stat. Ann. §27.3178 (150) (rev. ed., 1960), and the Pennsylvania intestate law. The Michigan statute provides:

"When any person shall die seized of any lands . . . not having lawfully devised the same, they shall descend . . . in the following manner:

"First, One-third to his widow, and remaining two-thirds to his issue . . .

"Second, If the intestate shall leave a husband or widow and no issue, one-half of the estate of such intestate shall descend to such a husband or widow. . .

"Fourth, If the intestate shall leave a husband or wife, and no issue, nor father, mother, brother nor sister, and there be no child of brother or sister, the estate of such intestate shall descend to the husband or wife of such intestate, as the case may be. . ."

Finally, it is important to note a judicial preference in interpreting the intent of testator when defining words used. In Burk Estate, 37 D. & C. 2d 528 (1965), the court recognized that "there is a long-established policy in Pennsylvania to protect the rights of widows in the estates of their husbands, and in case of doubt in matters relating thereto, they should be resolved in favor of the widow," and cited Pengelly Estate, 374 Pa. 358 (1953). Moreover, a constructional rule is found in Heizmann's Estate, 18 Berks 250, 253 (1926), that the meaning of such words as here in issue manifest not only "heirs at law as comprised within the strict meaning of the words,

but should include all those who take under the intestate law. . ." Also, in Wetherill's Estate, 4 D. & C. 667 (1924), the court said that "language to disinherit an heir or the next of kin must be precise and indubitable." Also in accord is Beck's Estate, 225 Pa. 578, where it is held:

"In its legal and technical sense the word 'heir' is understood as designating the persons appointed by law to succeed in case of intestacy, and wherever the word occurs in a will unaccompanied by qualifying or explanatory expressions, it must be allowed the meaning the law gives it, and those only will come within the class thus described who would take under the intestate laws. *And where qualifying expressions are relied on to give other than technical meaning, these must be so direct and unequivocal as to imperatively require such interpretation.*" (Italics supplied.)

3. Must Marguerite A. Noerr, widow of Floyd B. Noerr, be both a "lineal" and "direct" heir in order to bring herself within the ambit of the exception to the first-option provision in the charter?

Intervening petitioners have discerned an inconsistency which lends possible weight to their position. The amended charter article 7 makes frequent references to the words "lineal *and* direct heirs" as well as to "lineal *or* direct heirs." The contention is made that the use of the disjunctive "or" leads to the conclusion that the words "lineal" and "direct" must be considered to have different meanings and should not be equated as having the same meanings. See Miller v. Preitz, 422 Pa. 383, which held that "the use of the conjunction 'or' strengthens the natural conclusion that 'family' and 'household' have different meanings." Thus, stock could be conveyed by both direct and lineals, two classes, without making a first offer at book value to the corporation.

Intervening respondents reply to the effect that the transposition of "and" and "or", while permitted in some cases, should be permitted only in limited cases. In Gilmor's Estate, 154 Pa. 523 (1893), the court said:

"Courts of justice will transpose the clauses of a will and construe 'or' to be 'and' and 'and' to be 'or' only in such cases where it is absolutely necessary so to do, to support the evident meaning of the testator. But they cannot arbitrarily expunge or alter words without such apparent necessity."

Assuming this to be the case, should such exigent circumstance be existent in the present circumstance, the need to construe testator's intent to be one of preserving his wife's rights in his estate?

## CONCLUSION

We conclude that Marguerite A. Noerr, surviving widow of Floyd B. Noerr, falls within that group of individuals to which the stock transfer restrictions do not apply. Under the facts and circumstances of this case, viewed in the light of the intestate laws of this Commonwealth, we deem her to be a lineal or direct heir. To hold otherwise would offend the court's traditional notion of fair play and substantial justice.

It must be remembered that if the stock transfer restrictions are made applicable, it will work a severe forfeiture of the rights of the four children of testator, Floyd B. Noerr. It would appear clear that he intended his four children, who are unquestionably lineal or direct heirs, to become the owners of his stock. In reality, he did bequeath the stock to his children. At the same time, he wanted his widow to receive the emoluments thereof during her lifetime or widowhood. We see no reason why the granting of certain rights to the widow during her lifetime or widow-

hood should work a forfeiture as to the children and if at any future time any effort is made to sell the stock in violation of the transfer restriction, it could then be enjoined. If any of the rights in the stock which decedent willed to his widow are found repugnant to the stock restrictions, she might be enjoined from the exercise thereof without working a forfeiture which would prevent the children from becoming the owners thereof.

We, therefore, order and direct that the Russell National Bank, Executor of the Estate of Floyd B. Noerr, be enjoined and restrained from selling or offering for sale any of the stock of Noerr Motor Freight, Inc., or the Lewistown Materials Company, Inc., and are directed to distribute the stock of said companies in said estate in kind, properly endorsed to the effect that it is being held under and subject to the specific provisions of the will of Floyd B. Noerr, deceased, and the stock transfer restrictions contained in the amended articles of incorporation of the respective companies.