Filed 3/22/16  Estate of Hinz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| Estate of ETHEL JOSEPHINE HINZ, Deceased. | H038577 (Santa Clara County Super. Ct. No. 1-92-PR128527) |
| MARIA ORLANDO-HINZ, Petitioner and Appellant, v. MALISA BARCLAY et al., Objectors and Respondents. | |

Ethel Josephine Hinz (decedent) died testate in 1992.  Her handwritten will named her son and only surviving child, Lester F. Hinz, Jr. (Lester),[1] as "sole heir and executor to manage estate affairs."  Decedent's estate remained open when Lester died in 2009.  Shortly thereafter, appellant Maria Orlando-Hinz, Lester's widow and special administrator of decedent's estate, filed a Probate Code section 11700 petition to determine persons entitled to distribution of the property of decedent's estate.[2]  Orlando-Hinz argued that decedent's will unambiguously named Lester as the sole beneficiary of decedent's estate, worth more than $10 million.  Orlando-Hinz further argued that, as the sole beneficiary of Lester's estate, she was entitled to decedent's

_____

[1] We refer to some individuals by their first names where necessary for purposes of clarity and not out of disrespect.

[2] Unspecified statutory references are to the Probate Code.

estate.  Respondents, decedent's granddaughters Malisa Barclay and Leslee Warwick, opposed the petition, maintaining that decedent's will is ambiguous such that her estate should be distributed according to the laws of intestate succession.

Following a two-day trial, the court found the will failed because it contained ambiguities that were not clarified by extrinsic evidence.  Consequently, the court ordered that decedent's estate pass by intestate succession, with 50 percent distributed to Orlando-Hinz and 25 percent distributed to each of the respondents.

On appeal, Orlando-Hinz argues the trial court exceeded its jurisdiction by revoking a will that had been properly admitted to probate and erred in concluding that the will failed due to ambiguity.  We reverse and remand with directions.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Will

Decedent's handwritten will, dated November 29, 1991, states in its entirety:

"I, Ethel Josephine Hinz; aka as E.J. Hinz; declare that this will, is my only and last testament.

"I, name my son, Lester F. Hinz, Jr., as sole heir and executor to manage estate affairs.

"In the event of any challenges to said estate, I hereby authorize said Executor to dispense the amount of $1.00, one dollar, to any claimant.

"I am confident that my son, as Executor, will also subscribe to my wishes, along lines that were discussed previously and privately in the past.  A simple cremation, without ceremony is the wish of Ethel J. Hinz."

### B.    The Section 11700 Petition

Decedent died on May 4, 1992, about five months after executing her will.  Lester filed a petition for probate of the will in June 1992.  However, decedent's estate remained open at the time of Lester's death in 2009.  At that time, Orlando-Hinz, the estate's bookkeeper and Lester's wife, was appointed special administrator of decedent's estate.

2

In February 2010, Orlando-Hinz filed a petition pursuant to section 11700 to determine the persons entitled to distribution of decedent's estate's property. She maintained that the term "heir" in the phrase "I, name my son, Lester F. Hinz, Jr., as sole heir" should be read to mean "beneficiary." Respondents opposed the petition, arguing that decedent's will is ambiguous and that, as a result, her estate must be distributed according to the laws of intestate succession. They took the position that the will named Lester as executor but not as beneficiary, claiming the term "heir" in the phrase "I, name my son, Lester F. Hinz, Jr., as sole heir" should be read to mean "child." They further claimed that the fourth sentence of the will, regarding the "wishes" decedent had discussed with Lester, (the "wishes" clause) sought but failed to create a secret trust.

### C. Extrinsic Evidence Presented at Trial

During a two-day court trial in June 2012, the parties presented the following extrinsic evidence, which the court received provisionally to determine whether the will was ambiguous.

#### 1. Decedent's Estate

A 1998 inventory and appraisal valued decedent's estate at $10.372 million. At that time, the estate comprised several parcels of real property located in Santa Clara County, including property located on Quito Road in Saratoga (Quito Road Property). Decedent and her husband purchased the Quito Road Property in 1949 or 1950 and built a five-bedroom, six-bathroom home with a pool and tennis courts. The remaining properties were commercial.

Decedent's husband died in 1960, leaving his entire estate to decedent. Following her husband's death, decedent managed the tile company that he had owned. The Quito Road Property fell into serious disrepair after the death of decedent's husband. Eventually, the pool and tennis courts were unusable, the roof leaked, and the kitchen had unrepaired fire damage.

3

### 2. Decedent's Children

Decedent and her husband had two children together, daughter Leseth and son Lester.

Decedent and Leseth were very close. They spoke on the phone daily and frequently shopped together. Decedent celebrated holidays and birthdays with Leseth and her daughters, Malisa and Leslee (respondents). Leseth was diagnosed with esophageal cancer in the early 1980s. The cancer eventually killed her on November 8, 1991. After Leseth's death, decedent was very sad and stopped leaving the house.

Lester lived at the Quito Road Property with his mother for much of his life. Decedent supported him financially. At the time of decedent's death, Lester was unmarried and had no children.

### 3. Decedent's Granddaughters

Respondents, Malisa and Leslee, are Leseth's only children and decedent's only grandchildren.

Malisa and Leslee testified that they spent holidays and family birthdays with decedent as children and into adulthood. Despite being invited, Lester never attended those family gatherings.

Malisa testified that decedent was loving towards her family but not accepting of anyone who was not family. Accordingly, she had no friends who were not family members. Decedent warned Malisa to be wary of friends and boyfriends because they just wanted her money. Leslee recalled similar advice. According to Malisa, both her parents and Lester and his first wife divorced because of decedent's antagonism towards her children's spouses, whom she viewed as outsiders.

In the mid-1980s, decedent expressed a desire to Malisa that her property stay in the family. At about the same time, Malisa asked decedent whether she would like the family to restore the Quito Road Property for her. Decedent responded, "This will all be there for you. I'm too tired. You can deal with that when the time comes." In Malisa's

4

view, the will's "wishes" clause referred to decedent's desire that Lester ensure the estate stay in the family.

Leslee testified to three conversations she had with Ethel regarding estate matters. First, in the late 1970s, Ethel asked Leslee what she would do with the estate when it was hers. When Leslee said she would give a portion to charity, Ethel disapproved, saying it had to stay in the family. Second, in the mid-1980s, Leslee heard decedent telling Leseth she was worried that Leseth would have to sell part of decedent's estate when decedent died to pay probate taxes. Third, in the late 1980s, decedent was again discussing taxes. She told Leslee that the properties had to stay together because the income properties paid for the Quito Road Property.

A few months after decedent's death, Lester told Leslee he did not want to pay probate taxes on decedent's estate so he had tied the properties up in probate. He said she and Malisa could "deal with the taxes when it was [their] turn." In another conversation about the estate properties after decedent's death, Lester told Leslee "when it's your turn, you can do with it what you want."

Malisa and Leslee testified that they cared for their mother during her illness and visited decedent while she was in the hospital at the end of her life. Neither had any indication that decedent was ever angry with them or would want to disinherit them.

### 4. *Decedent's Niece*

Decedent's niece, Carole Derenale, testified that decedent was family-oriented and not accepting of outsiders. Decedent exerted what Derenale judged to be too much control over her children, Leseth and Lester. According to Derenale, decedent's dislike of outsiders extended to Leseth's husband and Lester's first wife.

Derenale testified that she called decedent in December 1991, shortly after Leseth's death, to see how she was doing. Decedent was very sad. During that conversation, decedent mentioned that she hoped her granddaughters and Lester "would do her the honor" of keeping the estate properties in the family.

5

### 5. Lester's Friend Maxwell Crumley

Maxwell Crumley testified for Orlando-Hinz that he was friends with Lester. The two met in approximately 1960 and remained close until Lester's death. Crumley frequently visited Lester at the Quito Road Property and got to know decedent during those visits. She struck him as sharp.

When Leseth was ill, Crumley overheard decedent on the phone asking someone (who he assumed was Leseth): "Why are the girls not doing that for you? Where are the girls?" He overheard multiple similar conversations. After those phone calls, he recalled decedent expressing disapproval of her granddaughters. After Leseth's death, Crumley heard decedent say they are only interested in the money and that "I'll not give them a dime of my estate." He believed she was referring to her granddaughters.

### 6. Decedent's Death

Decedent died on May 4, 1992. Shortly before her death, she fell at home and injured herself. She did not want to go to the hospital so Lester made a make-shift bed for her on the floor, where she remained for three days. Eventually, Lester called Leslee for help. According to Leslee, he was afraid he would be accused of elder abuse if he called an ambulance. Leslee went to the Quito Road Property and immediately called an ambulance. At the hospital, decedent underwent surgery for a broken hip. She underwent a second surgery to remove a cancerous growth from her forehead a few days later. She did not survive the second surgery.

### 7. Lester's Relationship with Orlando-Hinz, Illness, Will, and Death

Lester met Orlando-Hinz in 1994. After a few chance encounters, he hired her to help him organize and purge decedent's old business files. Their relationship became romantic in 1996. The two married in July 2007 after a 10-year engagement. In September 2006, prior to the wedding, Lester was diagnosed with cancer.

Orlando-Hinz testified that Lester wanted to close decedent's estate and was not avoiding paying estate taxes. To the contrary, she said he sold property to pay the taxes,

6

which were sizeable. The delay in closing the estate was due to litigation, which terminated shortly before Lester was diagnosed with cancer.

Lester died on April 25, 2009. Orlando-Hinz did not notify respondents of his death or invite them to the celebration of life she held for Lester.

Lester's will, prepared in 2009, left his entire estate to Orlando-Hinz and specifically disinherited respondents.

### D. *Statement of Decision*

The trial court issued a statement of decision on July 12, 2012. It found the will contained two ambiguities. First, the meaning of the word "heir" could mean beneficiary, surviving child, or person entitled to take property by intestate succession under the Probate Code. Second, the "wishes" clause is ambiguous because there is no evidence as to the content of decedent's private discussions with Lester. Having found the will ambiguous, the court admitted the extrinsic evidence offered by the parties in an effort to determine decedent's intent. However, the court concluded the evidence did not clarify her intent. Accordingly, the court concluded the will failed and ordered decedent's estate distributed according to the law of intestate succession.

## II. DISCUSSION

### A. *Legal Principles Governing the Interpretation of Wills*

" 'The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.' " (*Estate of Russell* (1968) 69 Cal.2d 200, 205; § 21102, subd. (a).)

The rules of construction in the Probate Code apply "where the intention of the transferor is not indicated by the instrument." (§ 21102, subd. (b).) Those rules of construction provide that "[t]he words of an instrument are to be given their ordinary and grammatical meaning unless the intention to use them in another sense is clear and their intended meaning can be ascertained. Technical words are not necessary to give effect to

7

a disposition in an instrument. Technical words are to be considered as having been used in their technical sense unless (a) the context clearly indicates a contrary intention or (b) it satisfactorily appears that the instrument was drawn solely by the transferor and that the transferor was unacquainted with the technical sense." (§ 21122.) The Probate Code's rules of construction further provide that "[t]he words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that will render any of the expressions inoperative. Preference is to be given to an interpretation of an instrument that will prevent intestacy or failure of a transfer, rather than one that will result in an intestacy or failure of a transfer." (§ 21120.) However, "[o]nly if the terms are ambiguous will the court resort to presumptions which create a legal presumption of intent" (i.e., the rules of construction). (*Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126, 134.) "Before resorting to legal presumptions . . . as with any written instrument, the court must attempt to ascertain the intent of the testator by examining the will as a whole and the circumstances at the time of its execution." (*Ibid*.)

Only by examining the circumstances surroundings a will's execution "can it be determined whether the seemingly clear language of the instrument is in fact ambiguous." (*Estate of Russell*, *supra*, 69 Cal.2d at p. 209.) Thus, "California law allows the admission of extrinsic evidence to establish that a will is ambiguous . . . ." (*Estate of Duke* (2015) 61 Cal.4th 871, 879.) Extrinsic evidence also is admissible "to clarify ambiguities in a will." (*Ibid*.) "[A]n ambiguity is said to exist when, in the light of the circumstances surrounding the execution of an instrument, 'the written language is fairly susceptible of two or more constructions.' " (*Estate of Russell*, *supra*, at p. 211.)

Our Supreme Court recently held, in *Estate of Duke*, that "an unambiguous will may be reformed to conform to the testator's intent if clear and convincing evidence establishes that the will contains a mistake in the testator's expression of intent at the time the will was drafted, and also establishes the testator's actual specific intent at the

8

time the will was drafted." (*Estate of Duke*, *supra*, 61 Cal.4th at p. 898.) The parties do not rely on the newly-articulated *Estate of Duke* rule.

"A decedent who dies without a valid will dies intestate." (Rest.3d Property, § 2.1, subd. (a), p. 55.) "The decedent's intestate estate, consisting of that part of the decedent's net probate estate that is not disposed of by a valid will, passes at the decedent's death to the decedent's heirs as provided by statute." (*Id*., subd. (b).)

### B. *Standard of Review*

"The trial court's threshold determination of ambiguity is a question of law subject to de novo review." (*Baker v. Osborne Development Corp*. (2008) 159 Cal.App.4th 884, 892.) We interpret a will independently unless its interpretation "turns upon the credibility of extrinsic evidence, or requires resolution of a conflict in that evidence . . . ." (*Estate of Dodge* (1971) 6 Cal.3d 311, 318.) In those circumstances, "the trial court determination is binding." (*Ibid*.) Where the extrinsic evidence is undisputed but the parties draw conflicting inferences from it, we independently draw our own inferences. (*Siegel v. Fife* (2015) 234 Cal.App.4th 988, 996.)

Respondents argue the record contains "conflicting extrinsic evidence." However, they do not identify any conflicts in the evidence. Nor do we perceive any. Crumley's testimony that decedent expressed an intent to disinherit her granddaughters towards the end of her life is not inconsistent with respondents' testimony that, between the late 1970s and late 1980s, decedent suggested they would eventually inherit her estate. Decedent may have changed her mind based on her perception that respondents did not do enough for Leseth during her illness.[3] Nor is Crumley's testimony inconsistent with Derenale's testimony that, in December 1991, Ethel said she hoped Lester and

---

[3] Respondents' testimony that they in fact made significant efforts to care for their mother does not mean decedent could not have concluded otherwise, whether reasonably or otherwise. The evidence indicates decedent could be a difficult woman and Leseth was her closest friend, which may have distorted her objectivity.

9

respondents would keep the estate in the family. Decedent may have assumed that Lester, who was unmarried and childless, would leave the estate to respondents after his death.

We also do not perceive any credibility issues. While the court noted that Crumley "may have some issues with memory, and specifically, dating events," it credited his testimony regarding decedent's statements about respondents.

"Since the record in the present case discloses no conflict in the extrinsic evidence, and no issues of credibility, it becomes our task to arrive at an independent interpretation of the will." (*Estate of Dodge*, *supra*, 6 Cal.3d at p. 318.)

### C. *The Trial Court Did Not Exceed its Jurisdiction*

Orlando-Hinz contends the trial court exceeded its jurisdiction under section 11700 by concluding the will failed because the court essentially "revoked a will which had been properly admitted to probate in 1992 without opposition or challenge." Orlando-Hinz notes that the time for a will contest had long passed and that it was established that the will expressed testamentary intent when it was admitted to probate. The gravamen of Orlando-Hinz's argument is that respondents "should be barred from contending, and the court barred from ruling, that the will lacks testamentary language."

Orlando-Hinz's view appears to be that the court improperly converted the section 11700 inquiry regarding the meaning of the will into a will contest. We disagree.

"In a will contest, the issues are limited to those concerning whether the document at issue is or is not the testator's duly executed, valid will." (*Estate of Smith* (1998) 61 Cal.App.4th 259, 265.) "A document's status as a testamentary instrument depends on the testator's intent." (*Ibid*.) Specifically, the question is whether the testator possessed "testamentary intent," meaning he or she "intended, by the particular instrument offered for probate, to make a revocable disposition of his property to take effect upon his death." (*Estate of Sargavak* (1950) 35 Cal.2d 93, 95.) In will contests, courts are not concerned

"with the meaning of the instrument, but with the intention with which it was executed." (*Id*. at p. 96.)

Here, respondents have never argued and the court did not conclude that decedent lacked testamentary intent when she executed the will. Everyone agrees that the will constitutes a testamentary instrument. Rather, at issue is the meaning of the instrument. That question is appropriately decided in a section 11700 proceeding. (Ross & Cohen, Cal. Practice Guide: Probate (The Rutter Group 2015) ¶ 15:644 [§ 11700 encompasses disputes regarding the interpretation of ambiguous provisions of decedent's will bearing on who is entitled to take under the will].) Accordingly, the court did not exceed its jurisdiction. Nor were respondents required to raise their arguments within the timeframe required for will contests, as Orlando-Hinz suggests.

### D. *The Term "Heir" As It Is Used In the Will Is Not Ambiguous*

Orlando-Hinz maintains the term "heir," as it is used in the will, is susceptible to only one meaning: beneficiary. Thus, she contends, the trial court erred in concluding the term is ambiguous. Respondents respond that the word "heir" also is reasonably susceptible to two other interpretations: (1) surviving child, and (2) "any person, including the surviving spouse, who is entitled to take property of [d]ecedent by intestate succession under [the Probate Code]." The latter is the definition ascribed to the word heir by the Probate Code. (§ 44.)

#### 1. *"Heir" is Susceptible to Being Construed as "Beneficiary"*

"[W]ords in a written instrument . . . should be given their ordinary usage, if possible. [Citation.] This policy has been incorporated into the Probate Code as a rule of construction." (*Estate of Newmark* (1977) 67 Cal.App.3d 350, 357; see § 21122.) Courts have looked to dictionary definitions as a source of the ordinary meaning of words. (See, e.g., *Estate of Newmark*, *supra*, at p. 357.) Accordingly, we begin by considering how various dictionaries define the word "heir."

11

Black's Law Dictionary states that "heir" is "[p]opularly" defined to mean "a person who has inherited or is in line to inherit great wealth." (Black's Law Dict. (10th ed. 2014) p. 840, col. 1.) It further notes that " '[l]aymen . . . wrongly assume that one who receives real property by will is an heir' " when " '[t]echnically, the word "heir" is reserved for one who receives real property by action of the laws of intestacy, which operate today only in the absence of a valid will.' " (*Id*., at p. 839, col. 2, quoting Thomas F. Bergin & Paul G. Haskell, Preface to Estates in Land and Future Interests 14 n.32 (2d ed. 1984).) Webster's Dictionary defines "heir" as "one who inherits or is entitled to inherit property." (Merriam-Webster Online Dict. <http://www.merriam-webster.com/dictionary/heir> [as of Mar. 22, 2016].) The American Heritage Dictionary defines "heir" as "[a] person who inherits or is entitled by law or by the terms of a will to inherit the estate of another." (American Heritage Online Dict. <http://www.ahdictionary.com/heir> [as of Mar. 22, 2016].) These dictionary definitions support Orlando-Hinz's position that the term "heir" is fairly susceptible to being construed as "one who is entitled to inherit property" or "beneficiary" (§ 24 [defining "beneficiary" as "person to whom a donative transfer of property is made . . . ."]), particularly in a will drafted by a layperson.

### 2. *"Heir" is Not Susceptible to Being Construed as Defined in the Probate Code*

The Probate Code defines "heir" as "any person, including the surviving spouse, who is entitled to take property of decedent by intestate succession under this code." (§ 44.) The pertinent sentence of the will provides, in full: "I, name my son, Lester F. Hinz, Jr., as sole heir and executor to manage estate affairs." It would be both inaccurate and nonsensical to "name" one individual as the "sole" person "who is entitled to take property of the decedent by intestate succession." Therefore, we conclude the term "heir" in decedent's will is not fairly susceptible be being construed to mean "any person,

12

including the surviving spouse, who is entitled to take property of decedent by intestate succession under [the Probate] code."

### 3. "*Heir*" *is Not Susceptible to Being Construed as* "*Surviving Child*"

Finally, we consider whether the term "heir," as it is used in decedent's will, is susceptible to the construction respondents propose: "surviving child." For that construction, respondents rely on the fact that decedent wrote the will shortly after her daughter died, leaving Lester as her sole surviving child. But Leseth's death made it unnecessary for decedent to "name" Lester as her sole surviving child. That was a fact.

Respondents also rely on cases published over 80 years ago in other jurisdictions, which interpreted the word "heir" to mean "child." The cases are distinguishable. In *Dunshee v. Dunshee* (1911) 251 Ill. 405, 413, the court concluded that when the testator referred to "the surviving heirs" of his brother in the will's 13th paragraph, he was referring only to his brother's children. The court was persuaded by the fact that, in an earlier paragraph, the testator had "named the heirs as [the children] showing clearly that it was the living children of [his brother] that the testator had in his mind when dispensing his bounty . . . ." (*Id.* at p. 414.) *Cook v. Underwood* (1930) 228 N.W. 629 is similar. There, the will stated that when the decedent's wife died, his " 'estate shall be equally divided between my heirs, Paul A. Underwood, W. Ray Underwood and Myrtle E. Underwood Cook—each to share alike.' " (*Id.* at p. 630.) The three individuals named were the decedent's children. The court concluded that the word "heirs" was used to mean "children." (*Ibid.*) In *Walters v. Sisler* (Mo. 1963) 371 S.W.2d 187, 190, the decedent left his property to his wife " 'for and during her life with remainder to my children and heirs hereinafter named.' " "All of the [decedent's] five children were thereafter named in the will and no other purported 'heirs' [were] named . . . ." (*Ibid.*) Thus, it was clear that the decedent used the words "children" and "heirs" synonymously. Here, unlike in the cases on which respondents rely, there is nothing to suggest that decedent used the word "heir" to mean "surviving child."

13

In respondents' view, the second sentence of the will should read:  "I, name my son, Lester F. Hinz, Jr., as my sole surviving child and executor to manage estate affairs." That construction is illogical.  Having already identified Lester as her "son," decedent had no reason to further identify him as her "child."  And, again, following Leseth's death, there was no reason for her to take any action to designate Lester as her "sole surviving child."  For this reason, we conclude the word "heir" as it is used in the will is not reasonably susceptible to the construction "surviving child."

> 4. *Extrinsic Evidence Does Not Show The Word "Heir" is Susceptible to More Than One Construction, and Thus is Ambiguous*

Respondents contend that their trial testimony, as well as that of Derenale, supports the trial court's finding that the will is ambiguous.  They rightly argue that testimony evinced a close relationship between each of the respondents and decedent, their grandmother.  But evidence that respondents and decedent had a close relationship does not prove the word "heir," as used in the will, is susceptible of two or more constructions.  (*Estate of Russell*, *supra*, 69 Cal.2d at p. 211.)  And that, of course, is the meaning of the word "ambiguity" in this context.  (*Ibid.*)

We acknowledge there is evidence indicating that, at least until the late 1980s, decedent intended for respondents eventually to own the properties in her estate. However, that evidence does not preclude us from construing the will as leaving decedent's entire estate to Lester for two reasons.  First, decedent may have changed her mind about leaving anything to respondents, as Crumley's testimony suggests.  Second, decedent may always have intended to leave her estate to Lester on the assumption he, an unmarried and childless man, would leave it to respondents, his closest relatives. Evidence that Lester suggested to Leslee that respondents eventually would own the estate properties also is not persuasive.  Those comments apparently were made prior to Lester's marriage, which likely changed his own estate plan.

14

Respondents also point to evidence showing that decedent disliked anyone who was not a close family member and wanted her estate to stay in the family. They contend that evidence establishes decedent would not have wanted her estate to go to Orlando-Hinz. We agree that decedent would be disappointed to see any portion of her estate go to a non-relative (a result respondents' preferred outcome does not avoid). However, at issue here is whether decedent intended to leave her entire estate to Lester or intended to split it up between Lester and respondents. In either case, her estate would have gone to family members. And, because Lester had not met Orlando-Hinz when decedent drafted the will, decedent had no reason to believe Lester might leave his estate to a non-relative. It is our job to determine decedent's "intention . . . as expressed in the instrument" (§ 21102, subd. (a)), not to reform the will to account for unanticipated events, such as Lester's subsequent marriage.

The extrinsic evidence may show respondents are deserving of an inheritance from decedent, but not that the will is ambiguous. For the foregoing reasons, we conclude the term "heir" is not ambiguous as it is used in decedent's will. It is susceptible to only one construction: "beneficiary."

### E. *Even if the Term "Heir" is Ambiguous, the Rules of Construction Support the Conclusion That Decedent Intended it to Mean "Beneficiary"*

Assuming the term "heir" is ambiguous, we must turn to the rules of construction to assist us in determining decedent's intent. Those rules lead us to conclude that decedent used the term "heir" as most laymen would—to mean one who is entitled to inherit property, or beneficiary.

One pertinent rule of construction is that "[t]echnical words are to be considered as having been used in their technical sense unless (a) the context clearly indicates a contrary intention or (b) it satisfactorily appears that the instrument was drawn solely by the transferor and that the transferor was unacquainted with the technical sense."

15

(§ 21122.) The word "heir" is a technical word defined by the Probate Code to mean "any person, including the surviving spouse, who is entitled to take property of the decedent by intestate succession under this code." (§ 44.) We conclude decedent did not use the term "heir" in its technical sense because "context clearly indicates a contrary intention." (§ 21122.) As noted above, it is simply nonsensical to name a "sole" person as the one who is entitled to take property by intestate succession where others—here, respondents—would be entitled to take by intestate succession. (And reading "sole" out of the will is inconsistent with the rule of construction that "words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that will render any of the expressions inoperative." (§ 21120.) Moreover, decedent's will evinces a lack of legal sophistication. It uses punctuation erroneously. As discussed below, it includes something similar to a no contest clause that it not limited to beneficiaries. This lack of legal sophistication supports the conclusion that decedent used the term "heir," not in its technical sense, but as most laymen would to mean the person entitled to inherit or the beneficiary.

This interpretation is consistent with the rule of construction that "[p]reference is to be given to an interpretation of an instrument that will prevent intestacy or failure of a transfer, rather than one that will result in an intestacy or failure of a transfer." (§ 21120.) By contrast, if respondents' argument that "heir" means "surviving child" is accepted, then the estate passes by intestate succession. Construing the word "heir" to mean "beneficiary" avoids this disfavored result. (*Estate of Grove* (1977) 70 Cal.App.3d 355, 362 [because "[t]he fact that a testator makes a will raises a presumption that he intended to dispose of all of his property[,] . . . whenever possible such interpretation must be placed upon the provisions of a will as will prevent partial or total intestacy"].)

16

## F. Other Provisions of the Will Do Not Change Our Conclusion That "Heir" Should Be Construed to Mean "Beneficiary"

Respondents claim that construing "heir" to mean "beneficiary" is inconsistent with two other provisions of the will. We disagree.

Respondents first argue the will's third sentence—which they call a no contest clause—would be unnecessary if there were only one beneficiary. The third sentence of the will provides: "In the event of any challenges to said estate, I hereby authorize said Executor to dispense the amount of $1.00, one dollar, to any claimant." It is true that no contest clauses generally apply only to beneficiaries. Specifically, " ' "a no contest clause conditions a beneficiary's right to take the share provided to that beneficiary under such an instrument upon the beneficiary's agreement to acquiesce to the terms of the instrument." ' " (*Estate of Gonzalez* (2002) 102 Cal.App.4th 1296, 1302.) But decedent, a layperson, did not limit the clause at issue to beneficiaries; she sought to forestall "any challenges to [her] estate" by "any claimant." She may well have believed that clause would prevent respondents from challenging her will. In any event, we are not persuaded that the will's third sentence is inconsistent with a provision leaving the entire estate to Lester.

Respondents' second argument, which relates to the will's fourth sentence or the "wishes" clause, is less clear.[4] They suggest that, if Lester were the will's only beneficiary, then the "wishes" clause would be precatory and superfluous. But they also argue that even if Lester is the will's only beneficiary, the "wishes" clause should be treated as mandatory, not precatory. Below, they took the position that the "wishes" clause (when regarded as mandatory) evinces a failed attempt to create a secret trust (failed because the clause is ambiguous).

---

[4] The fourth sentence provides, in full, "I am confident that my son, as Executor, will also subscribe to my wishes, along lines that were discussed previously and privately in the past."

17

We have already determined that the will's second sentence, naming Lester as "sole heir," "standing alone, would operate to bequeath [decedent's estate] to [Lester] absolutely." (*Estate of Kearns* (1950) 36 Cal.2d 531, 533.) "To impose a trust upon property bequeathed and devised to [Lester], it must appear that [decedent] intended to impose mandatory duties upon him." (*Estate of Collias* (1951) 37 Cal.2d 587, 589.)

Ordinarily, " ' "a mere request, or an expression of hope or confidence or expectation, does not import a command." ' " (*Estate of Collias*, *supra*, 37 Cal.2d at p. 589.) The "wishes" clause plainly is such an expression of confidence. However, " '[w]hile the desire of a testator for the disposal of his estate is a mere request when addressed to his devisee, it is to be construed as a command when addressed to his executor.' " (*Ibid*.) "Where[, as here,] the person directed to carry out the wishes of the testator is both executor and legatee, the courts in construing the effect of the language have refused to follow the strict rule which imposes a mandatory duty on the executor and have apparently treated the words as being addressed to him in his capacity as legatee." (*Estate of Kearns*, *supra*, 36 Cal.2d at pp. 534-535.)

We conclude that the "wishes" clause does not impose a trust on or otherwise limit the estate bequeathed to Lester. The "wishes" clause contains precatory language and is addressed to a person who is both executor and legatee. Under *Estate of Kearns*, we shall treat the clause as being addressed to Lester in his capacity as legatee, in which case they are precatory and not mandatory. Even assuming the "wishes" clause is addressed to Lester in his capacity as executor, neither the will nor the extrinsic evidence evince any intent to "convey [the estate to Lester] for a limited purpose," thus creating a trust. (*Lonely Maiden Productions*, *LLC v. GoldenTree Asset Management*, *LP* (2011) 201 Cal.App.4th 368, 383-384.) Significantly, the "wishes" clause does not even mention the estate or its disposition. Immediately following the "wishes" clause, in the same paragraph, is a sentence stating "A simple cremation, without ceremony is the wish of Ethel J. Hinz." Thus, context suggests the "wishes" clause relates to decedent's wishes

18

for the disposal of her body and any related services.  Extrinsic evidence indicates decedent was concerned with avoiding the taxation of her estate and that Lester tied the estate up in probate to avoid paying probate taxes.  That evidence suggests decedent's privately divulged wishes may have been that Lester, as executor, avoid paying probate taxes.

In sum, the "wishes" clause does not impose a trust on or otherwise limit the estate bequeathed to Lester.  Accordingly, the trial court erred in concluding that any ambiguity in that clause caused the bequest to Lester to fail.

## III.    DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to issue a new judgment ordering that 100 percent of the Estate of Ethel Josephine Hinz be distributed to the Estate of Lester F. Hinz, Jr.

_____
                          Premo, Acting P.J.




I CONCUR:




_____
            Elia, J.




Orlando-Hinz v. Barclay et al.
H038577

Márquez, J., Dissenting

I agree with the majority that the trial court did not exceed its jurisdiction when it ruled on Maria's[1] Probate Code section 11700 petition. (Maj. opn. at pp. 10-11.) I also agree that Malisa and Leslee's arguments were not time-barred. (Maj. opn. at pp. 10-11.) But I respectfully disagree with the majority's conclusion that the will is unambiguous. (Maj. opn. at pp. 11-15.) In my view, the word "sole heir" in Ethel's will, when reading the will as a whole, could mean "sole beneficiary" or "sole surviving child" and is therefore ambiguous. Moreover, the will does not unambiguously give, bequeath, leave, or devise Ethel's estate to Lester since it directs Lester, as sole heir *and Executor*, "to manage estate affairs." Also, the clause in which Ethel says she is "confident" that Lester will "subscribe to [her] wishes" is specifically directed to Lester "as Executor." Furthermore, the third sentence of the will refers to "challenges to said estate" instead of challenges to the will, and it again refers to Lester only as "Executor." These references to the "Executor," the "estate," and management of "estate affairs" at the very least create ambiguity when considered alongside the reference to Lester as "sole heir."

I would conclude the trial court properly admitted extrinsic evidence provisionally to determine whether the will was ambiguous, and then properly admitted that evidence to clarify the ambiguities. I would also conclude the ambiguities were not clarified by the extrinsic evidence and that the estate should pass under the laws of intestacy. I would therefore affirm the judgment.

## Conflicting Evidence on the Question Whether Ethel Intended to Disinherit her Granddaughters

The majority concludes there are no conflicts in the evidence. The majority states: "Crumley's testimony that decedent expressed an intent to disinherit her granddaughters towards the end of her life"—in late 1991—"is not inconsistent with respondents'

---

[1] I will refer to members of the Hinz family by their first names for clarity.

testimony that, between the late 1970s and late 1980s, decedent suggested they would eventually inherit her estate."

I would conclude there was conflicting evidence on whether Ethel intended to disinherit her granddaughters at the time she wrote her will. Maxwell Crumley testified that shortly before Leseth died, he overheard Ethel on the phone questioning Leseth about the care Malisa and Leslee provided to her. He also testified that he heard Ethel express disapproval after she hung up the phone about what she felt Malisa and Leslee should be doing for Leseth. And he testified that he overheard Ethel use the word "bloodsucker" and complain that Malisa and Leslee were "only interested in the money" and could not wait to get Leseth's estate settled, but he did not know who Ethel was talking to when she made those comments. Crumley also testified that he overheard Ethel say " 'I'll not give them a dime of my estate,' " and other comments to that effect. On cross-examination, Crumley admitted that Ethel never discussed her will or her testamentary wishes with him.

By contrast, there was the testimony of Ethel's niece, Carole Derenale. Derenale testified that she spoke directly with Ethel about her wishes in December 1991, shortly after Ethel prepared her will. This discussion occurred around the same time Crumley said he overheard Ethel's comments about her granddaughters. Ethel and Derenale discussed the fact that Ethel's sister sold Ethel's mother's house after their mother died. Ethel told Derenale it was important to keep property in the family. She said she hoped her granddaughters and Lester "would do her the honor" of keeping the properties in the estate as a legacy to her husband. Derenale also testified that Ethel did not say she wanted the property to go only to her granddaughters, but to both Lester *and* her granddaughters. Derenale told Ethel to "make sure you have a trust." And she testified that Ethel did not express any animosity toward or dissatisfaction with her granddaughters. Furthermore, Derenale never heard Ethel say she was disinheriting her

2

granddaughters or say they were "in it for the money." According to Derenale, Ethel was as close to Malisa and Leslee as she was to Leseth.

The trial court concluded that "Derenale's testimony was in dramatic counterpoint to" Crumley's testimony. It said, "The Court doesn't doubt that Ethel may have vented on occasion in Mr. Crumley's presence, but occasional venting clearly does not prove an intent to disinherit the two granddaughters. Ethel's positive reactions to the two granddaughters during her last hospitalization militate[] against such a conclusion." The court also questioned whether Crumley had "some issues with memory."

Since there was conflicting evidence on this issue, under our standard of review, we are bound by the trial court's finding if supported by substantial evidence. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318 (*Dodge*).) In my view, Derenale's testimony is substantial evidence that supports the trial court's finding that Ethel did not intend to disinherit Malisa and Leslee. I would conclude this factual finding is binding on this court in its interpretation of the will. (*Ibid.*)

## Meaning of the Word "Heir"

Ethel's brief holographic will is by no means a model of clarity. There are errors in punctuation, with periods missing and commas placed where they are not needed. The no-contest clause refers to "challenges to said estate" rather than challenges to the "will." And Ethel used the term "heir" to describe Lester, not "beneficiary," "legatee," "devisee," or some other word that clearly describes a person who takes under a will. In addition, she did not use any words like "give," "bequeath," "leave," or "devise," which would have indicated that an outright gift had been made to Lester.

"[A]n ambiguity is said to exist when, in the light of the circumstances surrounding the execution of an instrument, 'the written language is fairly susceptible of two or more constructions.' " (*Estate of Russell* (1968) 69 Cal.2d 200, 211 (*Russell*).)

3

When interpreting a will, extrinsic evidence of the circumstances under which the will was made may be considered by the court in ascertaining what the testator meant by the words used in the will.  If in light of such extrinsic evidence the provisions of the will are reasonably susceptible of two or more meanings claimed to have been intended by the testator, extrinsic evidence is admissible to prove which of such meanings, if any, was intended by the testator. (*Id.* at p. 212.)  "[I]t cannot always be determined whether the will is ambiguous or not until the surrounding circumstances are first considered." (*Id.* at p. 213.)  The parties do not dispute that the trial court properly admitted extrinsic evidence in this case to determine whether Ethel's will was, in fact, ambiguous.

Ethel's will "name[s]" Lester "as sole heir and executor to manage estate affairs." Maria contends the reference to "sole heir" is unambiguous and *means* "sole beneficiary."  Malisa and Leslee contend the word "heir" has many definitions, both technical and non-technical, and that "sole heir" *may mean* "sole child."

Both sides quote several dictionary definitions of the word "heir."  Webster's Third New International Dictionary defines "heir" in part as "**1a:**  one who inherits or is entitled to succeed to the possession of property after the death of its owner as:  (1) HEIR AT LAW, . . . , (5)**:**  one who receives some of the property of a deceased person by operation of law, by virtue of a will, or in any of various other ways." (Webster's 3d New Internat. Dict. (1993) p. 1050.)  The same dictionary defines "heir at law" as "an heir in whom an intestate's real property as distinguished from his [or her] personal estate is vested by operation of law and not by will . . . ." (*Ibid.*)

Black's Law Dictionary defines "heir" as "1. A person who, under the laws of intestacy, is entitled to receive an intestate decedent's property.  . . .  2. Loosely (in common-law jurisdictions), a person who inherits real or personal property, whether by will or intestate succession.  3. Popularly, a person who has inherited or is in line to inherit great wealth." (Black's Law Dict. (8th ed. 2004) p. 740.)

4

Probate Code section 44 defines "heir" as "any person, including the surviving spouse, who is entitled to take property of the decedent by intestate succession under this code." (All further statutory references are to the Probate Code.) The statutory definition is consistent with well-established case law. (See e.g., *Estate of Layton* (1933) 217 Cal. 451, 457; *Estate of Wilson* (1920) 184 Cal. 63, 67 ["The word 'heirs' is a technical term, and in its 'technical sense' one's 'heirs' means the persons who would be entitled to succeed at his [or her] death to his [or her] estate in case of intestacy"].)

The record contains no direct evidence regarding Ethel's understanding of the word "heir," either in its technical or non-technical sense. Ethel wrote her will three weeks after Leseth died. At that time, Lester was her sole surviving child, but not her sole heir at law. Malisa and Leslee were also her heirs at law.

Maria argues the will is not reasonably susceptible to the interpretation that "heir" means "child." Malisa and Leslee acknowledge "there are no California cases directly on point," but they argue there are numerous cases from other states in which a court determined that the word "heir" as used by the testator in those cases means "child." They cite eight cases, including *Cook v. Underwood* (Iowa 1930) 228 N.W. 629, 630 (testator's use of the word "heirs" was "the equivalent of 'children,' as 'sons, ' and 'daughter' ") and *Walters v. Sisler* (Mo. 1963) 371 S.W.2d 187, 190 (bequest to " 'my children and heirs hereinafter named' "; under the circumstances of that case, the words "heirs" and "children" were synonymous). These cases support the assertion that in some circumstances "heir" can indeed mean "child." Lester was Ethel's sole surviving child when Ethel wrote her will. Ethel's use of the words "my son" and "sole heir" in the same sentence supports the conclusion that Ethel may have meant either "sole surviving child" or "sole beneficiary" in that sentence, creating an ambiguity.

## No Donative Language

The will also does not contain any donative language. Ethel did not "give" or "bequeath" or "leave" or "devise" anything to Lester. Instead, Ethel "name[d]" Lester "sole heir and executor to manage estate affairs." The language Ethel used may be contrasted with the language of her husband's will, which the trial court judicially noticed. Ethel's husband's will stated: "I hereby *give, devise, and bequeath* all the rest and residue of my property, after the payment of debts and expenses . . . to my wife, ETHEL . . . ."

In addition to naming Lester executor "to manage estate affairs," Ethel stated she was confident that her "son," in his role "as Executor," would subscribe to her wishes. If Ethel had intended for Lester to be her sole beneficiary, Lester would have owned the property outright and there would have been nothing for him to manage or wishes for him to subscribe to.

When considering the extrinsic evidence provisionally admitted, it is unclear whether Ethel intended to make an outright gift to Lester only, or whether she intended that he manage estate assets during his lifetime for the benefit of the family. Ethel managed and lived off of her husband's estate assets after he died. Lester helped her manage the estate and also lived off the estate's assets for many years. Derenale testified that Ethel also provided financial support to Leseth. After Ethel died, Lester continued to manage and live off the estate assets for another 17 years. I find it significant that Lester never closed Ethel's estate during his lifetime. There was litigation regarding estate taxes, but that litigation resolved and the taxes were paid in 2000. Lester nonetheless kept the estate open for another nine years after he paid the taxes, until the time of his death in 2009.

I also find it noteworthy that three or four years after Ethel died and before Lester married Maria, Leslee suggested he develop some of the property to help pay the taxes.

In response, Lester said: " '. . . when it is your turn, you can do with it what you want.' " These facts support the conclusion that Ethel may have intended to leave the estate to Lester in trust for the benefit of her family. (See e.g., *Estate of Collias* (1951) 37 Cal.2d 587, 588-590 (*Collias*).)

## A Will May Name Only an Executor

Maria asserts it is implausible that Ethel wrote a will solely to nominate Lester as her executor. But a testator may make a will that nominates an executor without designating a beneficiary or devising any property. Such an instrument is a valid will. (*Estate of Fries* (1965) 238 Cal.App.2d 558, 562, quoting *In re Hickman* (1894) 101 Cal. 609, 613 ["The fact that a testator nominates an executor, but, without giving a legacy or devising any part of his property, makes it none the less a will"]; see also *Estate of Karkeet* (1961) 56 Cal.2d 277, 279 [holographic will named executor but no beneficiary; extrinsic evidence should have been admitted on question whether executor was also intended beneficiary of the will].)

One of Malisa and Leslee's theories at trial was that the "wishes" clause contained a trust whereby Ethel named Lester executor to manage estate assets in accordance with Ethel's wishes expressed to him in private for the benefit of all heirs. Given the significant history of Ethel and Lester's management of Ethel's husband's estate, and the substantial evidence that Ethel wanted to keep the estate assets in the family, Ethel could have named Lester executor without expressly designating him a beneficiary of the will. I do not agree it is *implausible* Ethel would name an executor in her will without naming a beneficiary.

## "Wishes" Clause

I also respectfully disagree with the majority's conclusion that the "wishes" clause—the sentence that states, "I am confident that my son, as Executor, will also subscribe to my wishes, along lines that were discussed previously and privately in the past"— does not impose a trust on or otherwise limit the estate bequeathed to Lester. (Maj. opn. at pp. 17-19.)  I would conclude the "wishes" clause is ambiguous.

Citing *Collias, supra,* 37 Cal.2d 587, 589, Maria argues that since Lester was both the sole beneficiary and the executor of Ethel's estate, any wishes expressed to him as described in the wishes clause were precatory only and not binding.  The testator in *Collias* named his nephew to serve as executor of his estate and gave his nephew the residue of his estate.  The testator also expressed the " 'desire and wish that my *nephew* Argirios Collias will give half of my estate' " to relatives in Greece.  (*Id.* at p. 588; italics added.)  The court noted that the decedent's nephew was "the sole devisee, and the wish and desire is addressed to him *as the testator's nephew*." (*Id.* at p. 590; italics added.)  The court concluded that the entire estate was bequeathed outright to the nephew, the wishes clause was directed to him as a devisee, not executor, and therefore no "trust or equitable charge was created" that limited "the absolute bequest of the entire estate" to the nephew.  (*Id.* at p. 590.)

By contrast, Ethel stated she was confident "that my son, *as Executor*, will also subscribe to my wishes." (Italics added.)  Since the "wishes" clause was directed to Lester in his capacity "as Executor" and not as sole beneficiary, I would conclude Lester was required to comply with the wishes Ethel had expressed to him "previously and privately in the past."  But because Ethel and Lester are both deceased, there was no evidence adduced at trial of Ethel's private discussions with Lester regarding the disposition of her estate, other than Leslee's testimony that Lester once said, " 'when it is your turn, you can do with it what you want.' "  Neither Lester nor Ethel left any notes or

8

memoranda outlining what they had discussed privately regarding the estate. And Maria, who had been the estate's bookkeeper since 1995, did not provide any evidence that shed light on this language. I note, however, that Lester's management of the estate for 17 years without closing it, including for nine years after he paid the estate taxes, supports the inference that Ethel may have told him to hold the property in trust for her heirs.

## Other Rules of Construction

Maria also relies on the statutory presumption that "[p]reference is to be given to an interpretation of an instrument that will prevent intestacy or failure of a transfer, rather than one that will result in an intestacy or failure of a transfer." (§ 21120.) But Maria's application of the presumption against intestacy conflicts with the rule of construction that where a will is capable of two interpretations—one in which blood relatives of the testator will take and the other in which the property will go to strangers—the interpretation by which blood relatives of the testator will take is preferred. (14 Witkin, Summary of Cal. Law (10th ed. 2005) Wills & Probate, § 205, p. 277, citing *Estate of Hartson* (1933) 218 Cal. 536, 540, and other cases.) More importantly, the "paramount concern in construing a will is to determine the subjective intent of the testator." (*Estate of Duke* (2015) 61 Cal.4th 871, 890, citing *Russell*, *supra*, 69 Cal.2d at p. 205 and 4 Page on Wills (Bowe-Parker rev. 2004) § 30.1, p.2.)

Under the majority's interpretation, the estate goes entirely to Maria, the sole beneficiary of Lester's estate. But Ethel never met Maria. Maria started dating Lester years after Ethel died. There was uncontradicted evidence that Ethel was antagonistic toward her children's spouses, which contributed to the break-up of both of her children's marriages. It was also uncontested that Ethel had limited interactions with people outside the family, but she maintained strong family ties and socialized at least once a month with Leseth, Malisa, Leslee, and her great grandchildren. Ethel did not accept or trust

9

outsiders and stated more than once that it was important to keep the property in the family. Ethel managed the estate property for 32 years after her husband died and used the estate's assets to support herself, Lester, and Leseth.

Ethel's strong connection to her family and Lester's delay in closing her estate militate against an interpretation that Ethel unambiguously intended Lester to be her sole beneficiary. At the time Ethel wrote her will, Lester was single and had been single for many years. There was no evidence he was dating anyone or that Ethel ever considered that he might remarry long after she died. A construction of the will by which the entire estate passes to Maria is inconsistent with the uncontradicted extrinsic evidence that Ethel intended that her property remain within the family, as well as the court's factual finding that Ethel did not intend to disinherit her granddaughters.

## Conclusion

I would conclude the trial court did not err when it rejected Maria's contention that "sole heir" in Ethel's will unambiguously means "sole beneficiary." In my view, reading the will as a whole, when Ethel named Lester "sole heir," she could have meant sole beneficiary or sole surviving child. The will also contains references to the "Executor," the "estate," and management of "estate affairs," all of which at the very least create ambiguity when considered alongside the reference to Lester as "sole heir." Thus, the will is susceptible to both the interpretation urged by Maria and the one advanced by Malisa and Leslee. I therefore agree with the trial court's conclusion that the will is ambiguous.

The will named Lester to serve as executor to manage estate affairs. But there was no evidence of Ethel's specific wishes regarding the management of her estate or the matters she discussed "previously and privately" with Lester. I therefore also agree with the trial court that even with the assistance of extrinsic evidence, it is impossible to

discern Ethel's intentions regarding the disposition of her estate—other than it should remain in the family—and the estate should therefore be distributed according to the rules of intestate succession. No one disputes that Ethel's will was a valid will and my conclusions would not invalidate the will. My conclusions would merely address the distribution of her estate through the will.

For all these reasons, I would affirm the judgment.

_____
Márquez, J.

Orlando-Hinz v. Barclay, et al.
H038577

11